[No. B225782. Second Dist., Div. Two. Nov. 30, 2011.]

LONELY MAIDEN PRODUCTIONS, LLC, et al., Plaintiffs and Appellants,
v.
GOLDENTREE ASSET MANAGEMENT, LP, et al., Defendants and Respondents.

**COUNSEL**

Holland & Knight, Bruce S. Ross, Richard T. Williams and Roger B. Coven for Plaintiffs and Appellants.

Latham & Watkins, Wayne S. Flick, Wendy P. Harper and Kristine L. Wilkes for Defendants and Respondents.

**OPINION**

**ASHMANN-GERST, J.**—The primary question presented is whether a secured lender may foreclose on funds held by a payroll processing company and thereby defeat subsequent claims to those funds asserted by unsecured creditor employers who contend that the funds should have been used to meet the payroll processing company's payroll obligations. The answer is yes when, as here, the funds paid by the unsecured creditor employers were not held in trust. Thus, the trial court properly denied the summary adjudication motion filed by the appellants[1] (collectively the film clients) as to whether

---

[1] The appellants are Lonely Maiden Productions, LLC; NBTT Productions, LLC; RMC Productions LLC; Accidental Husband Intermediary, Inc.; Sophomore Distribution, LLC; Hostage Productions LLC; Hostage Funding LLC; Sordid Productions, LLC; and Simon Cinema Ltd. In keeping with the usage in the parties' briefs, separate references to "Hostage" refer to both Hostage Productions LLC and Hostage Funding LLC. Similarly, a reference to

GoldenTree Asset Management, LP, and GTAM Special Realty, LLC (collectively GoldenTree), had a duty to refrain from foreclosing on funds held by Axium International, Inc., and its wholly owned subsidiaries (collectively Axium), and the trial court properly granted summary judgment in favor of GoldenTree with respect to the film clients' causes of action for unjust enrichment and conversion. Consequently, the film clients' attack on these rulings does not survive appellate scrutiny.

As a separate matter, the film clients argue that their fraud cause of action against GoldenTree should have survived demurrer. Due to deficiencies in the pleading, which we elucidate below, this argument lacks merit.

We affirm the judgment.

## FACTS

In 2007 and early 2008, the film clients (except for Hostage and Simon Cinema Ltd.) used Axium to provide payroll processing, staffing and other services with respect to specified film projects. The parties signed written service agreements which provided that Axium would serve as the joint employer of the cast and crew for each film; the film clients would provide all relevant payroll details to Axium; Axium would calculate, inter alia, wages and withholdings; Axium would invoice the film clients for the amounts due; and once the film clients transferred the invoiced amounts, Axium would issue payroll checks to cast and crew and pay withholdings to the appropriate entities. Pursuant to. an oral agreement, Hostage hired Axium to process residuals for a film that had been previously produced.

Sordid paid Axium a $500,000 security deposit.

Axium defaulted on a loan to GoldenTree. GoldenTree had a perfected security interest in Axium's general deposit accounts and foreclosed on them, resulting in a transfer of $28 million.

The film clients sued GoldenTree to recover the funds they had paid to Axium. Following several rounds of pleading, the film clients filed their second amended complaint and alleged causes of action for fraudulent concealment, fraud, breach of fiduciary duty, unjust enrichment, conversion and violation of Business and Professions Code section 17200 et seq. According to the general allegations, when Axium defaulted on its loan, GoldenTree decided to improve its financial position by forcing Axium to

---

"Sordid" identifies Sordid Productions, LLC, and Simon Cinema Ltd. According to the opening brief, Simon Cinema Ltd. is the parent company of Sordid Productions, LLC.

aggressively invoice and collect money from the film clients. Those invoices amounted to affirmative misrepresentations by GoldenTree and Axium that the funds would be used for no other purpose but paying wages, residuals and withholdings. Only after the film clients paid the invoices did GoldenTree initiate foreclosure and seize the funds. GoldenTree demurred to the second amended complaint. The demurrer was overruled as to conversion and unjust enrichment but sustained without leave to amend as to the remaining claims. The film clients moved for summary adjudication as to whether GoldenTree had a duty to refrain from seizing the funds. The same day, GoldenTree moved for summary judgment or adjudication. The trial court denied the film clients' motion and, concurrently, granted GoldenTree's motion. Judgment was entered in favor of GoldenTree.

This timely appeal followed.

## STANDARD OF REVIEW

If an appeal challenges an order "sustaining a demurrer without leave to amend, the standard of review is well settled. The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.] And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment. [Citation.]" (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) The legal sufficiency of the complaint is reviewed de novo. (*Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 790 [90 Cal.Rptr.2d 598].)

Summary judgment and summary adjudication motions pursuant to Code of Civil Procedure section 437c are also reviewed de novo. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517]; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843–857 [107 Cal.Rptr.2d 841, 24 P.3d 493].) "[W]e apply the same three-step analysis used by the superior court. We identify the issues framed by the pleadings, determine whether the moving party has negated the opponent's claims, and determine whether the opposition has demonstrated the existence of a triable, material factual issue." (*Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 261 [76 Cal.Rptr.2d 382].)

# DISCUSSION

## I. *Fraud.*

In dismissing the fraud cause of action, the trial court concluded that the film clients failed to sufficiently allege a misrepresentation by GoldenTree. The film clients assign error to this ruling because they alleged that "[GoldenTree] made numerous affirmative misrepresentations of material facts" by communicating "through employees of Axium." More specifically, the film clients point to their allegation that "[GoldenTree] caused Axium to continue sending invoices and billing statements" to the film clients and "[e]ach such invoice or billing statement that [GoldenTree] encouraged or caused Axium to send to each" of the film clients "constituted an affirmative representation by [GoldenTree] and Axium that the money requested to be transferred to Axium would be . . . used by Axium . . . only for the purpose of paying wages and compensation to" the film clients' "employees and for paying associated federal and state taxes, benefit plan contributions, and residuals required by collective bargaining agreements."

In our view, the film clients failed to make a case for reversal. To allege fraud based on misrepresentation, a plaintiff must allege a misrepresentation, knowledge of its falsity, intent to defraud, justifiable reliance and resulting damages. (*Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104, 109 [128 Cal.Rptr. 901].) "The representation must ordinarily be an affirmation of *fact*. [Citations.]" (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 773, p. 1122.) Sometimes it can be a misrepresentation of law or a false promise that contains an implied misrepresentation of intention to perform the promise. (*Id.*, §§ 774–782, pp. 1123–1134.) And it is true, as the film clients point out, that a misrepresentation can be made through a conduit. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 219 [197 Cal.Rptr. 783, 673 P.2d 660].) But, simply put, the film clients did not allege an actionable misrepresentation of fact or intention to perform because they did not allege that Axium's invoices expressly stated or promised how the film clients' funds would be used. When it is boiled down, they have essentially alleged a claim based on an implied false promise. To our knowledge, however, no such tort has been recognized by California law.

## II. *Duty, unjust enrichment and conversion.*

According to the film clients, there are triable issues as to duty, unjust enrichment and conversion because the evidence demonstrates that the funds were held in express or resulting trust, they retained an interest in the funds, and GoldenTree was therefore not entitled to take them. The film clients

contend that an express or resulting trust can be established by the written service agreements, Axium's receipt of the funds as a paying agent, and the course of dealing. We disagree. The film clients failed to establish rights superior to the rights of a secured lender.

### A. Contract interpretation (part 1).

■ Pursuant to the parol evidence rule, extrinsic evidence cannot be used to contradict or supplement an agreement if it is intended to be a final expression of that agreement and a complete and exclusive statement of the terms. But extrinsic evidence is admissible to explain or interpret ambiguous language. (Code Civ. Proc., § 1856, subds. (b) & (g).) Whether the parol evidence rule applies "depends upon whether there was an 'integration' [citation] or 'a complete expression of the agreement of the parties . . .' [citations]. [¶] Generally, finality may be determined from the writing itself. If on its face the writing purports to be a complete and final expression of the agreement, parol evidence is excluded. [Citations.]" (*Pollyana Homes, Inc. v. Berney* (1961) 56 Cal.2d 676, 679–680 [16 Cal.Rptr. 345, 365 P.2d 401] (*Pollyana Homes*).)

Each service agreement provides: "This Agreement sets forth the entire agreement of the parties, and supersedes all prior and contemporaneous agreements, understandings, covenants and conditions relating to the subject matter hereof. This Agreement may not be changed, amended, modified, or supplemented, except by a writing signed by both [Axium]" and the film clients. Based on *Pollyana Homes, supra*, 56 Cal.2d 676, we conclude that the foregoing integration clause establishes that the written service agreements are complete and final expressions of the parties' terms. Parol evidence, then, can only be used for purposes of interpretation.

### B. Contract interpretation (part 2).

The film clients contend that the written service agreements required Axium to use funds paid on invoices solely for payroll processing.[2] GoldenTree contends that Axium's use of the funds was unlimited.

■ When parties dispute the meaning of contractual language, the trial court must provisionally receive extrinsic evidence offered by the parties and determine whether it reveals an ambiguity, i.e., the language is reasonably susceptible to more than one possible meaning. If there is an ambiguity, the extrinsic evidence is admitted to aid the interpretative process. "When there is

---

[2] The film clients posit that a contractual limitation on the use of the funds means that they were held in trust.

no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law. [Citations.] . . . If, however, there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the jury. [Citations.]" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126–1127 [76 Cal.Rptr.3d 585], fn. omitted.)

The film clients maintain that they offered the following extrinsic evidence: numerous examples of timecards, invoices and payments; the deposition testimony of the individuals who entered into the service agreements confirming their understanding that Axium was required to use the funds for payments designated by the invoices; and the deposition testimony of Jeff Begun, a salesman for Axium who stated that he understood that the film clients believed and expected that the funds would be used to make payments designated by the invoices. Based on this evidence, the film clients argue that "Axium's obligation to use the funds [the film clients] provided in payment of an invoice to make the payments designated and quantified in that invoice, if not explicit, is certainly implied by the process described [in the service agreements]. At the very least, the [service agreements] are reasonably susceptible to the interpretation that such an obligation existed."

■ Underlying this argument is an insurmountable problem. The film clients make no attempt to dissect specific language of the service agreements. In other words, they do not quote a particular section, paragraph, sentence, phrase or word and tell us whether it is ambiguous. After reviewing the written service agreements on our own, we conclude that they do not impose any express limits on Axium's use of the funds. Moreover, the contractual language is not reasonably susceptible to the film clients' interpretation. Regarding the contention that the written service agreements implied a restriction, the law offers no aid. "A court may find an implied contract provision only if (1) the implication either arises from the contract's express language or is indispensable to effectuating the parties' intentions; (2) it appears that the implied term was so clearly within the parties' contemplation when they drafted the contract that they did not feel the need to express it; (3) legal necessity justifies the implication; (4) the implication would have been expressed if the need to do so had been called to the parties' attention; and (5) the contract does not already address completely the subject of the implication. [Citations.]" (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1222 [92 Cal.Rptr.3d 17].) Without spending undue time on the matter, suffice it to say that the implied term urged by the film clients is not justified by legal necessity. There was no legal reason why the funds could not be paid to Axium for its general use when the service agreements obligated Axium to make all payroll-related payments.

C. *Agency.*

The film clients contend that Axium was their paying agent with respect to the funds.[3] But the service agreements provide in relevant part: "Nothing contained herein shall constitute a partnership between, nor joint venture by, the parties hereto or make either party an agent of the other." To overcome this obstacle, the film clients contend: "Undoubtedly, the parties disclaimed any intent to form a . . . general agency relationship under the Service Agreements. But Axium did not act as [the film clients'] general agent; it acted as a special agent [citation] making specific designated payments for [the film clients] and, accordingly, [the service agreements are] reasonably susceptible to the interpretation advanced by [the film clients] that Axium was their paying agent." The infirmity with this argument is threefold. First, the service agreements disclaim an agency as opposed to general agency. Second, the film clients offered no extrinsic evidence or analysis regarding ambiguity or the meaning of the language. Third, the language is not reasonably susceptible to the interpretation that Axium was the film clients' special agent.

Even if the service agreements did not initially create an agency relationship, the film clients argue that the service agreements were modified by conduct. They rely on *Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906 [74 Cal.Rptr.3d 733] (*Employers Reinsurance*). The film clients' reliance is misplaced. *Employers Reinsurance* stated that a course of performance can be used to interpret an insurance contract and made a passing reference to California Uniform Commercial Code section 1303, subdivision (f). (*Employers Reinsurance, supra*, at pp. 920–921.) That statute provides: "Subject to Section 2209, a course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance." (Cal. U. Com. Code, § 1303, subd. (f).) According to California Uniform Commercial Code section 2209, subdivision (2), "[a] signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded . . . ." *Employers Reinsurance* did not apply California Uniform Commercial Code section 1303, subdivision (f) or section 2209, subdivision (2). Here, assuming that the California Uniform Commercial Code applies, that latter statute is triggered because the service agreements could only be modified in writing.[4] Conduct, therefore, does not factor into our analysis.

---

[3] The law provides that in the absence of special circumstances, money received by one in the capacity of agent are not his, and the law implies a promise to pay them to the principal upon demand. (*Advanced Delivery Service, Inc. v. Gates* (1986) 183 Cal.App.3d 967, 975 [228 Cal.Rptr. 557].) Based on this rule, the film clients maintain that they, not Axium, retained beneficial interest in the funds.

[4] Though Hostage did not execute a written service agreement, it did not offer an independent agency analysis. In the absence of argument from Hostage, we need not reach the issue.

■ In their reply brief, the film clients tacitly suggest that the parol evidence rule does not apply to disclaimers of agency. They cite *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25 [130 Cal.Rptr.2d 860] (*Wolf*) and *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375 [75 Cal.Rptr.3d 333, 181 P.3d 142] (*City of Hope*). In each case, the court held that no fiduciary duty existed. In doing so, they reviewed allegations (*Wolf*) and evidence (*City of Hope*) rather than relying on contractual disclaimers which, while broad, did not expressly disclaim the existence of a fiduciary duty. Based on these cases, the film clients suggest that we must ignore the disclaimer of agency and examine the extrinsic evidence. But neither case discussed the parol evidence rule or, for that matter, the California Uniform Commercial Code. A decision is not authority for a proposition not considered. (*Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1268 [48 Cal.Rptr.2d 12, 906 P.2d 1112].)

D. *Express trust.*

1. *The applicable law.*

■ The Probate Code provides that an express trust can be created by a transfer of property by the owner to another person as trustee. (Prob. Code, § 15200, subd. (b); 13 Witkin, Summary of Cal. Law (10th ed. 2005) Trusts, § 25, p. 596.) But only if "the settlor properly manifests an intention to create a trust." (Prob. Code, § 15201.) California trust law is essentially derived from the Restatement Second of Trusts. Over a number of years, the Restatement Second of Trusts has been superseded by the Restatement Third of Trusts. (13 Witkin, Summary of Cal. Law, *supra*, Trusts, §§ 12, 17, pp. 579–580, 583–585.) As a result, we may look to the Restatement Third of Trusts for guidance.

■ "When one person transfers funds to another, it depends on the manifested intention of the parties whether the relationship created is that of trust or debt. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or one or more third persons, a trust is created. If it is intended, however, that the person receiving the money shall have the unrestricted use of it, being liable to pay a similar amount to the payor or a third person, whether with or without interest, a debt is created. [¶] The intention of the parties is ascertained by considering their words and conduct in light of all the terms and circumstances of the transaction." (Rest.3d Trusts, § 5, com. k, p. 60); see also *Abrams v. Crocker-Citizens Nat. Bank* (1974) 41 Cal.App.3d 55, 59 [114 Cal.Rptr. 913] [citing the same text in the Rest.2d Trusts and noting that "[t]he view expressed in the Restatement has been generally adopted in California"].) In general, a settlor may manifest the intention to create a trust by written or spoken words, or by conduct.

(Rest.3d Trusts, § 13, com. b, p. 207.) The settlor is not required to use the words "trust" or "trustee." (*Ibid.*) In interpreting the settlor's words and conduct, the circumstances surrounding the transfer may be considered unless they are excluded by the parol evidence rule. (*Ibid.*)

## 2. *Nature of the relationship with Axium (excluding Hostage).*

■ The service agreements are not ambiguous, which means that extrinsic evidence cannot be considered to explain the terms. Thus, we are left with service agreements that imposed no limits on Axium's use of funds, but which also did not affirmatively state that the funds belong solely to Axium. In our view, the service agreements therefore do not establish the existence of express trusts for the simple reason that the payroll parties did not properly manifest intention. Our holding is consistent with the rule recognized by federal case law. (*In re Black & Geddes, Inc.* (Bankr. S.D.N.Y. 1984) 35 B.R. 830, 836 ■ ["It is a firmly established principle that if a recipient of funds is not prohibited from using them as his own and commingling them with his own monies, a debtor-creditor, not a trust, relationship exists"].) In the absence of a trust, Axium and the film clients had no more than a debtor-creditor relationship.

In arguing that there are triable issues, the film clients advert to the following rules in the Restatement Third of Trusts. "It is immaterial whether or not the settlor knows that the intended relationship is called a trust, and whether or not the settlor knows the precise characteristics of a trust relationship. [¶] The manifestation of intention requires an external expression of intention as distinguished from undisclosed intention. [Citation.] There may, however, be a sufficient manifestation of the intention to create a trust without communication of that intention to the beneficiary or to the trustee or any third person. [Citations.] [¶] On the other hand, no trust is created unless the settlor manifests an intention to impose enforceable duties." (Rest.3d Trusts, § 13, com. a, p. 207; see *Marsh v. Home Fed. Sav. & Loan Assn.* (1977) 66 Cal.App.3d 674, 681–682 [136 Cal.Rptr. 180] (*Marsh*) [" ' "[A]n express trust may arise even though the parties in their own minds did not intend to create a trust. As in the case of the making of a contract, so in the case of a trust, an objective rather than a subjective test is applied. It is the manifestation of intention which controls and not the actual intention where that differs from the manifestation of intention." ' "].)[5] Inferably, the film clients suggest that even if they did not intend to create an express trust, they did so unintentionally. But they run into the same wall as before. They

---

[5] The film clients quote *In re Interborough Consol. Corp.* (2d Cir. 1923) 288 Fed. 334, 347 as observing, "Every person who receives money to be paid to another, or to be applied to a particular purpose, to which he does not apply it, is a trustee . . . ." This adds nothing new to the discussion.

did not properly manifest intention to create an express trust and the parol evidence rule bars extrinsic evidence from showing otherwise.

We now turn to a case cited by the film clients, *Chang v. Redding Bank of Commerce* (1994) 29 Cal.App.4th 673 [35 Cal.Rptr.2d 64] (*Chang*). There, a property owner (Chang) hired a general contractor named Paragon to construct a hotel. The contract provided "that '[Paragon] shall promptly pay each Subcontractor, upon receipt of payment from [Chang], out of the amount paid to [Paragon] on account of such Subcontractor's Work, the amount to which said Subcontractor is entitled . . . .' " (*Chang, supra*, at p. 678.) Chang made the required payments and Paragon deposited the money into its business checking account. It then issued checks to the subcontractors. The bank recorded the checks tendered by the subcontractors as paid, then reversed the transactions and seized the money as a setoff because Paragon had defaulted on a loan. Chang sued the bank for unjust enrichment and to impose a constructive trust. The bank obtained summary judgment, and the Court of Appeal reversed. It concluded "that progress payments received by a general contractor pursuant to a contract which requires that they be paid to subcontractors are held by the contractor in trust for the benefit of the subcontractors. A bank that has knowledge sufficient to require inquiry whether funds deposited by a general contractor to its account with the bank are trust funds cannot, as against the subcontractors, set off the funds to pay an indebtedness owed the bank by the general contractor." (*Ibid.*) Any attempt by the film clients to analogize to *Chang* cannot succeed. Simply put, *Chang* is distinguishable because the service agreements did not state that Axium was specifically required to pay the employees out of the amounts paid to Axium by the film clients.

*In re Golden Triangle Capital, Inc.* (Bankr. 9th Cir. 1994) 171 B.R. 79 (*Golden Triangle*) and *Marsh, supra*, 66 Cal.App.3d 674, are also distinguishable.

In *Golden Triangle*, a $95,000 check was made payable to Brandt, the principal of a lender called Golden Mortgage Fund #14 (Fund #14). Fund #14 agreed to loan $95,000 to a company called Camino Del Norte Partners II (Camino). Camino's principal was Findley. The parties contemplated that a loan servicing agent (GTC) would receive the funds from Fund #14 and transfer them to Camino. According to Fund #14, the front of the $95,000 check to Brandt stated " 'RE: FINDLEY.' " Brandt endorsed the back of the check restrictively and wrote, " 'Pay to GTC/Findley.' " (*Golden Triangle, supra*, 171 B.R. at p. 80.) The check was given to GTC, which deposited the check. Before GTC could transfer the funds to Camino, California's Department of Real Estate and the FBI seized the funds and turned them over to GTC's court-appointed receiver. After GTC went into bankruptcy, Fund #14 filed a complaint for declaratory relief in the bankruptcy court to determine

entitlement to the $95,000. In turn, the chapter 7 trustee filed a motion for summary judgment and prevailed. On appeal, the ruling was reversed. (*Id.* at p. 81.) The reviewing court concluded that the parties intended to create an express trust, and that GTC was "intended to be a mere conduit for the funds." (*Id.* at p. 83.) According to the Bankruptcy Appellate Panel of the Ninth Circuit, "The [e]ndorsement by [the lender's president] on the cashier's check, 'Pay to GTC/Findley' supports this intent." (*Ibid.*)

At issue in *Marsh* was whether funds held by a lender in property tax impound accounts were held in express trust. The court answered that question in the affirmative. It stated: "The manifested intent expressed by the [loan] document language '*held* by the Beneficiary *in trust* in the general funds without interest,' (italics added), leads to the conclusion the parties intended the money 'shall be kept or used as a separate fund for the benefit of the payor or a third person' [citation]. [Citation.] [The lender] clearly considered the impounds as something other than an ordinary debt where it reported the funds in a separate account and even on the briefest of financial statements separated the impounds from other debts. In their execution of these documents and then making the impound payments under these provisions the borrower-trustors manifested their intent to create a trust complete with subject, purpose and beneficiary [citation]. These manifestations were accompanied by the lender-trustee's acts and words expressing its acceptance of the trust and its subject, purpose and beneficiary [citation]. [The lender] drafted the documents expressing its trustee status in the establishment and operation of a specially designated account made up of borrowers' money and as the draftsman would suffer an interpretation most strongly against it [citations]. [The lender] stated its intent to be a trustee for the benefit of the homeowner borrowers. [It] was not a debtor of the homeowner borrowers with unrestricted use of the impounds." (*Marsh, supra,* 66 Cal.App.3d at pp. 683–684 [relying on Civ. Code, repealed §§ 2221, 2222 & the Rest.2d Trusts].)

*Golden Triangle* and *Marsh* were both based on evidence of properly manifested intention, so they provide the film clients no aid. A perusal of the service agreements proves the point. They did not, as in *Marsh*, state that the funds would be held by Axium in trust. Also, the film clients do not advert to any evidence that the funds were separated into impound accounts.

### 3. *Sordid's security deposit.*

According to Sordid, there is a triable issue as to whether the $500,000 security deposit it paid to Axium was held in trust.

This claim lacks traction.

██ With regard to security deposits, the Restatement Third of Trusts, section 5, comment k, page 63, states: "Where a person deposits money with another as security for the faithful performance of obligations owed to the other, it depends on the manifestation of intention of the parties whether the person holding the money is a debtor or is a trustee with a security interest in the money. If it is understood that the money is to be kept for the depositor and returned when the depositor has performed the obligations, the money is held in trust. If the understanding is that the money may be used as the holder's own, with the amount of it to be paid to the depositor when the latter's obligations have been performed, the relationship is one of debt."

The question, in our view, is whether Sordid manifested intention to create a trust. That intention, however, as we previously discussed, must be set forth in the service agreement because any other evidence of intention is barred by the parol evidence rule. The project schedule attached to the service agreement executed between Axium and Sordid provided in relevant part: "To secure [Sordid's] performance under this Agreement, [it] shall provide [Axium] with the sum of payroll and expenses for two (2) weeks of principal photography. Such deposit shall be paid prior to the processing of any payroll information, and if [Sordid] fails to provide the required sum, [Axium] shall have no obligation to provide any services whatsoever. Such deposit is not an advance payment, and [Sordid] must still make payment in accordance with the terms of this Agreement."

The parties did not use the term "trust" or "trustee." They did not place any limits on Axium's use of the security deposit, nor did they agree that the security deposit had to ever be returned. Sordid is silent as to whether the contractual language is ambiguous and reasonably susceptible to their interpretation. Rather, it relies on *People v. Pierce* (1952) 110 Cal.App.2d 598, 605 [243 P.2d 585] (*Pierce*), a case which quoted a treatise as follows: " 'Contractual relations are creative of trusts in infinitely varying circumstances . . . a "trust" exists where property or funds are placed by one person in the custody of another,—e.g., a deposit of money to be retained . . .—or where the legal title of property is conveyed for a limited purpose, as for example, the securing of performance of an obligation by the transferor.' "

The *Pierce* court acknowledged, under superseded statutory law, that "a voluntary trust is created by the words and acts of the trustor and trustee, indicating with reasonable certainty the intention of the trustor to create a trust, the intention of the trustee to accept it, and the subject, purpose, and beneficiary of the trust. [Citations.] Whether a trust relationship arises from a particular transaction is to be determined from any written agreement plus the acts and declarations of the parties." (*Pierce, supra,* 110 Cal.App.2d at p. 605.) Thus, it is clear that the intention to convey property for a limited

purpose was not presumed under the state of the law in 1952. In that respect, *Pierce* is consistent with current law. Intention must be established by evidence. The parties in *Pierce* manifested intention to create a trust because the contract provided that the plaintiff would place money with the defendant; the money was to be held by the defendant as a bond of faithful performance; the money was to draw interest at the rate of 4 percent per annum; and the money was returnable to the plaintiff 30 days after expiration of the contract. The court not only considered the language of the written contract, it also considered the parties' conduct. *Pierce* is easily distinguishable from the case at bar. Unlike the contract in *Pierce*, the service agreement does not refer to a bond, interest, or the return of the money at a set time. Moreover, we are barred by the parol evidence rule from considering extrinsic evidence.

Sordid makes reference to the deposition testimony of the representative who signed Sordid's service agreement. We are told that this representative understood that the security deposit would be returned when performance was complete. We are also told that the trial court sustained an objection to this testimony. Sordid assigns error to this ruling. But it did not analyze the relevant law, nor did it explain how the purported error resulted in prejudice. Notably, the representative's unilateral understanding was not admissible to prove the meaning of the service agreement because the service agreement was not ambiguous.

Based on the evidence and law, we conclude that the security deposit created a debt rather than a trust.[6]

Despite the foregoing, Sordid states, "[GoldenTree] presented **no** evidence regarding [Sordid's] claim for recovery of its security deposit . . . and, therefore, failed to meet its burden." No analysis of the moving papers is offered. Rather, we are cited to GoldenTree's separate statement and 1,361 pages of appellant's appendix. Tacitly, we are invited to comb through the record in search of error. We decline. "As a general rule, 'The reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment.' [Citations.] It is the duty of counsel to refer the reviewing court to the portion of the record which supports appellant's contentions on appeal. [Citation.] If no citation 'is furnished on a particular point, the court may treat it as waived.' [Citation.]" (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 [75 Cal.Rptr.2d 27].)

---

[6] Sordid cites *Action Apartment Assn. v. Santa Monica Rent Control Bd.* (2001) 94 Cal.App.4th 587, 599 [114 Cal.Rptr.2d 412], for the proposition that a security deposit given by a tenant remains the property of the tenant even though it is held by the landlord. This citation does not change our analysis.

4. *Hostage.*

 Hostage did not enter into a written agreement with Axium. Nonetheless, Hostage used Axium's services. In the absence of a written agreement, the parol evidence rule does not apply. (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 343 [9 Cal.Rptr.3d 97, 83 P.3d 497].) Consequently, to determine whether Hostage properly manifested intention to create an express trust, we can consider the words and conduct of the parties as permitted by the Restatement Third of Trusts, section 5, comment k, page 60.

In its summary judgment papers, GoldenTree cited the deposition testimony of a Hostage executive named Dennis Brown (Brown). He testified that Hostage entered into an oral agreement with Axium to perform payroll services. Brown intended and understood that the terms and conditions were the same as those in the service agreements for the other film clients. Hostage tells us that the trial court "relied on this evidence to treat Hostage as if it also had signed a [s]ervice [a]greement." But according to Hostage, "[t]he evidence regarding the agreement may [also] include the deposition testimony of [Brown], [and] . . . [Brown's] declaration and the invoices provided to Hostage by Axium." Hostage then states: "The evidence clearly shows that Hostage provided funds to Axium in payment of an invoice that set forth in great detail each and every payment that would be made with the funds." Based on this, Hostage argues that it "had the right to assume that Axium would use [the] funds to make the payments listed on that invoice, and Hostage's representative testified that Hostage understood that the funds would be used solely for that purpose."

Upon scrutiny, the referred evidence fails to achieve its purported effect. The invoice does not state that the funds to be paid will be received in trust or segregated. Nor does the invoice state that residuals will be paid out of the specific funds paid by Hostage. Rather, the invoice merely provides an accounting of payments, taxes, fees and benefit contributions. It must also be mentioned that the invoice was generated by Axium, not Hostage, and therefore could not be an objective and external manifestation of Hostage's intention to create a trust.

In his declaration, Brown stated that "it was always the case . . . that the funds [Hostage] provided to Axium were provided specifically to pay the invoices that Axium had issued and to fund the specific payments listed in those invoices, and for no other purpose. [¶] It was never the intent of [Lonely Maiden Productions, LLC, NBTT Productions, LLC, RMC Productions LLC, Accidental Husband Intermediary, Inc., Sophomore Distribution, LLC or Hostage] that the funds [they] provided to Axium could be used for any purpose other than as stated in the invoices, and no one from

Axium ever indicated in any way that they believed that Axium had free use of our money." GoldenTree objected to these statements on the grounds that they contradicted Brown's deposition testimony, they violated the parol evidence and best evidence rules, and they were irrelevant and otherwise inadmissible as hearsay and improper opinion. The trial court sustained each objection. In the opening brief, Hostage ignored the trial court's ruling. In other words, Hostage did not argue and establish that the trial court erred. As a result, we cannot consider the statements in Brown's declaration. Even if we did, it would be pointless because Brown failed to offer evidence of an external manifestation of intention.

### E. *Resulting trust.*

 "A resulting trust arises when a person (the 'transferor') makes or causes to be made a disposition of property under circumstances (i) in which some or all of the transferor's beneficial interest is not effectively transferred to others (and yet not *expressly* retained by the transferor) and (ii) which raise an unrebutted presumption that the transferor does not intend the one who receives the property (the 'transferee') to have the remaining beneficial interest. [¶] Because the transferee under such a disposition is not entitled to the beneficial interest in question and because that beneficial interest is not otherwise disposed of, it remains in and thus is said 'to result' (that is, it reverts) to the transferor or to the transferor's estate or other successor(s) in interest. The transferee is said to hold the property, in whole or in part, upon a resulting trust for the transferor (the 'beneficiary' of the resulting trust) or for the transferor's successors in interest (the 'beneficiaries'). Therefore, the beneficial interest that is held on resulting trust is simply an equitable reversionary interest implied by law, with the 'resulting trust' terminology ordinarily being applied if and when the reversionary interest materializes as a present interest." (Rest.3d Trusts, § 7, com. a, p. 86; see *Lloyds Bank California v. Wells Fargo Bank* (1986) 187 Cal.App.3d 1038, 1042 [232 Cal.Rptr. 339] ["A resulting trust arises by operation of law from a transfer of property under circumstances showing that the transferee was not intended to take the beneficial interest."].)

 "Resulting trusts usually . . . arise in express-trust situations in which an owner of property transfers its full *legal* title to a trustee but fails to make full, effective disposition of the beneficial—that is, *equitable*—interests in the property." (Rest.3d Trusts, § 7, com. b, p. 88).) "Sometimes a transfer of property is made to one person and the purchase price is paid by another, and no express trust is declared and no other agreement is made to allocate the beneficial rights in the property. Often the presumption in these cases is that the transferee is intended to take no beneficial interest and therefore holds the property on resulting trust for the person who paid the purchase price." (Rest.3d Trusts, § 7, com. c, p. 89.)

In their opening brief, the film clients contend: "All of the facts necessary for . . . the implication of a resulting trust[] are present in this case." Despite this representation, the film clients did not specifically discuss which evidence supports a resulting trust, and whether there are triable issues. Moreover, the film clients failed to explain why their resulting trust theory is not barred by the parol evidence rule. These analytical deficiencies aside, we reviewed the record on our own. We fail to perceive error. The film clients paid money to Axium pursuant to invoices. There is no indication in the record that beneficial interest was not transferred. Moreover, the service agreements placed no restrictions on Axium's use of the invoiced funds or any security deposit. In other words, the film clients transferred beneficial interest to Axium and cannot be heard to claim otherwise.

## DISPOSITION

The judgment is affirmed.

GoldenTree is entitled to its costs on appeal.

Doi Todd, Acting P. J., and Chavez, J., concurred.