Filed 5/13/22  Subtronic Corporation v. Weco Industries CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| SUBTRONIC CORPORATION,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>WECO INDUSTRIES, LLC et al.,<br><br>    Defendants and Respondents. | A159484<br><br>(Contra Costa County<br>  Super. Ct. No.<br>MSC1602346) |

Appellant Subtronic Corporation (Subtronic) agreed to purchase an Electro Scan, Inc. (Electro Scan) pipeline leak detection system from its distributor Weco Industries, LLC (Weco).  Three years after the purchase, Subtronic claimed it agreed to the purchase based on the mistaken belief that there was a one-time fee, rather than an annual charge, for the software support and processing it acquired in connection with the system, and brought this action to rescind the contract and for alleged unfair business practices.

During the bench trial, the court admitted extrinsic evidence to interpret the contract, which it found was ambiguous.  The court concluded that while the contract did not explicitly state the software support and processing fee was an annual charge, rather than a one-time fee, the evidence established that it was, indeed, an annual charge and that Subtronic was not mistaken about the nature of the charge.  The court also concluded Subtronic

1

did not prove Electro Scan engaged in any unfair business practice.  We affirm.

## BACKGROUND[1]

Subtronic's business involved locating and inspecting underground utilities, sewer pipes and storm drains.  Electro Scan developed and manufactured a new type of equipment and software to detect leaks more quickly and more accurately in sewer pipes six to 20 inches in diameter, known as the ES-620 Lateral System (ES-620).  Weco was the exclusive distributor of Electro Scan products and had been doing business with Subtronic for over 25 years.

For about a year and a half, Subtronic, through its CEO Jonathan Taylor (Taylor) and Weco, via its salesperson Thomas Johnson Jr. (Johnson),[2] had ongoing discussions regarding Subtronic's purchase of an ES-620 system.  The "sticking point" was Electro Scan's data processing fee of $2.00 per foot.  Taylor did not want to pay a per-foot fee but was willing to pay "up front for data processing" instead.  According to Johnson, the discussions "started from $2 a foot, and then it went to a dollar a foot, then it went to $75,000 a year— or $75,000 the first one and 70 a year after that.  And I think it went 55 to 50, and then 25 to 20 I believe is what we finally knocked it down to."

At some point after that, Taylor contacted Johnson and said he wanted to proceed with purchasing the ES-620 system and asked that the terms be put in writing.

---

[1] Although Electro Scan filed a cross-complaint for interference with contract and interference with prospective economic advantage and the court found in Subtronic's favor, Electro Scan has not appealed.  We therefore do not set forth any facts pertaining to those cross-claims.

[2] Thomas Johnson Sr. (Johnson Sr.), Johnson's father, was the owner of Weco and "the one who sends the quotes out."

On September 3, 2013, Johnson sent an e-mail to Johnson Sr., copying the Electro Scan team,[3] stating they had a "deal" with Subtronic. The e-mail stated in part: "John [Taylor] from Subtronic has called me an[d] wants this in writing. 1. quote for ES-620 full install. 2. The deal saying its $20,000 per year for unlimited GPM [gallons per minute]. And 2,500 license fee. Deal only good till [O]ct. 1 2013." Electro Scan's director of sales, O'Keefe, e-mailed a quote back to Johnson, stating "All this should be summed up in this quote—you are welcome to reformat onto your Weco quote sheet."

Johnson then e-mailed Taylor a quote for the ES-620, stating "Attached is the Quote for the Electro Scan ES 620. This quote is valid only until 09-30-13 for the unlimited GPM processing fee."

The quote, prepared by Johnson Sr. on a Weco quote sheet, listed seven line items totaling $181,195.[4] The first four items, which were not the subject of negotiations, were $95,000 for the "ES-620 for Sewer Mains," $17,500 for a "CCTV Truck Integration Package," $10,000 for "CCTV/Electro Scan Installation," and $4,500 for "ES-620 Funnel Plug Jet Attachment."

The fifth line item was $20,000 for "ES-660 Desktop/Laptop App." A footnote to that item stated, "Includes installation of desktop application on existing CCTV truck computer or laptop. Software suitable for installation on Windows Vista, Windows 7, or Windows 8 PC, minimum 32GB RAM and 100GB Storage. Ruggedized laptop can be provided at additional cost.

---

[3] The e-mail copied Charles Hansen, the president and CEO of Electro Scan, Andrew O'Keefe, the director of sales, Mark Grabowski, the marketing manager, and Marc Lyons.

[4] Although Weco states in its respondent's brief that the quote was for $181,695.00, and the components of the quote do total $181,695.00, the quote, itself, states "Total Quote $181195.00," (some capitalization omitted) and Taylor testified that is what Subtronic paid.

Annual software maintenance fee of $2,500 applies after first year to maintain registration and updates."

The sixth line item was $5,000 for "ES-Premium Support Services." A footnote explained, "Represents one (1) two User Pack for Annual Subscription to www.CriticalSewers.com, Electro Scan Inc.'s Cloud Computing application to store, access, view, and export field data and reports. Includes all software upgrades and customer support from 9am–4pm, Pacific Standard Time, five (5) days a week."

The seventh line item was $15,000 for "Advanced Data Management." The accompanying footnote stated, "Advanced Data Management provides unlimited access to GPM Infiltration Rate Calculations in the Critical Sewers Cloud Interface."

Johnson testified negotiations were primarily about line items 6 and 7, the $5,000 for Premium Support Services and the $15,000 for Advanced Data Management. He was "clear in [his] discussions" with Taylor that "there was going to be an annual fee to renew the software." According to Johnson, he and Taylor "spoke about it sometimes weekly" and "[t]here was no doubt in [his] mind that [Taylor] knew that there was an annual fee."

Taylor testified he understood that the only annual fees would be $5,000 for the Premium Support Services in line item 6 and $2,500 for the annual software maintenance fee noted in footnote 4 to item 5, the "Desktop/Laptop App." He believed the $15,000 charge for "Advanced Data Management" in line item 7 was a one-time fee. Taylor asserted Johnson never told him the $15,000 was an annual fee, and he would not have accepted the quote if he had known that.

Hansen, the CEO of Electro Scan, testified he was the one who made the ultimate decision as to whether to "empower Weco to offer this quote to

4

Mr. Taylor." The $20,000 annual fee was the "sum total of Items 6 and 7, the [$]5,000 plus the [$]15,000." There was no doubt in his mind this was an annual fee. He explained "[w]e had only talked about that as an annual fee from the very beginning," after Subtronic "said that they wanted . . . an annual number." Hansen was personally involved in calculating the annual fee. He did so by looking at "how many linear feet . . . a good . . . subcontractor could do on a job. . . . [W]e started with an amount that was roughly 50,000 feet, $2, so that the number was about . . . $100,000 per annual time period." Hansen testified Subtronic tried to get a lower amount, and they "finally settled on figuring that about 10,000 feet would be a small number times 2, that would be about $20,000. And that would be . . . paid on an annual basis."

Subtronic accepted the quote and paid $181,195. The ES-620 was installed by Electro Scan on one of Subtronic's trucks.

About a year later, in November 2014, Electro Scan sent a renewal invoice for $20,000 to Subtronic. Taylor testified that when he received the renewal invoice, he told his "accounts payable to take it out of the system" because he "wasn't going to pay it. I had no intention of paying it. [¶] . . . [¶] The advanced data management support at $15,000 came out of nowhere." Taylor went back to the quote to see if he misunderstood it, and "got confused because of those notes with the numbers in parenthes[es]." He called Johnson and asked " 'Why are we receiving this invoice. That is not what we had agreed.' " Taylor understood "we wouldn't have support [from Electro Scan] until this resolved."

Taylor expressed a different understanding of the fee in an e-mail to a potential customer. Taylor wrote that Electro Scan "indicated to us in an email that they could not support us anymore as we had failed to pay their

5

exorbitant $20,000 annual service fee. I had explained we had no interest from customers that year so saw no reason to pay the fee."

Johnson's testimony was in keeping with Taylor's e-mail—that Subtronic did not pay the renewal invoice because it "really didn't have any big jobs going," so it "didn't pay the annual fee." Johnson's understanding was that Subtronic was waiting to pay the fee until it got a job that would cover it. Johnson spoke with Taylor about "downgrading to a one user pack to try and save money." Johnson also asked Electro Scan whether the agreement could be changed to a "one user pack" to save money on the $20,000 annual fee but did not recall a response.

Johnson further testified that at the time Subtronic refused to pay the annual renewal fee, Taylor never told him it was not part of the deal or objected to its existence. Instead, Taylor tried to negotiate a lower fee.

Hansen similarly testified "Taylor didn't want to pay anything, and that if he did, he was . . . waiting for a profitable job to pay it." At that point, Taylor had not communicated to Electro Scan that the renewal fee was in error. Taylor's company did, however, try to sell the ES-620 system back to Electro Scan.

Over a year and a half later, in June 2016, Taylor sent an e-mail to Mark Grabowski of Electro Scan, asking " 'could you please respond to the question of whether you will provide software support to our company if we pay the annual fee. We would like to discuss the $20,000 annual fee with a view toward encouraging more business with a reduced fee. If you're not willing to provide any more support, the question is moot.' " Grabowski responded that "the issue was moot," because Taylor "wasn't willing to even pay the full fee" and Electro Scan was not "interested in a lower rate for renewal."

Taylor responded " 'When we purchased the Electro Scan system, there was no mention of the requirement to maintain a perpetual annual fee or face cessation of support.' " This was the first time Taylor claimed he did not think he had to pay an annual fee, and Grabowski felt "it was very different from all the emails [he] had received from Mr. Taylor, being that it almost seemed like it had been written by counsel." The last sentence of the e-mail stated " 'Please respond with a reasonable offer within ten days or I will be taking steps to recover my investment in your equipment with a civil action filed in superior court.' "

Subtronic subsequently filed the instant action for rescission based on mistake and failure of consideration, and for unfair business practices.

Following a bench trial, the court issued a 12-page statement of decision, concluding Subtronic failed to establish entitlement to rescission on either theory, and failed to prove any unfair business practice.

## DISCUSSION

### *Sufficiency of Statement of Decision*

After the trial court issued its tentative statement of decision, Subtronic filed objections. These included that "Subtronic requests additional findings of fact/conclusions of law/statement of decision concerning the following issues: [¶] . . . [¶] Did the Quote include an annual obligation of $15,000 for advanced data management services?" In the final statement of decision, the court "decline[d] Subtronic's request to address additional issues finding that the matters are already adequately covered."

Subtronic claims on appeal that the court erred in failing to make a specific finding "as to whether the contract between the parties included an obligation by Subtronic Corporation to pay an annual Advanced Data Management fee, among other requests."

7

A "statement of decision is required only to set out ultimate findings rather than evidentiary ones." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125.) A trial court " 'is not required to respond point by point to the issues posed in a request for statement of decision. The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.' [Citations.] 'When this rule is applied, the term "ultimate fact" generally refers to a core fact, such as an essential element of a claim.' [Citation.] 'Ultimate facts are distinguished from evidentiary facts and from legal conclusions.' [Citation.] Thus, a court is not expected to make findings with regard to 'detailed evidentiary facts or to make minute findings as to individual items of evidence.' " (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 983.) The statement of decision need only "fairly disclose[] the court's determination as to the ultimate facts and material issues in dispute in each phase of the proceedings." (*Antelope Valley Groundwater Cases* (2020) 58 Cal.App.5th 343, 358.)

The trial court's statement of decision more than meets the foregoing requirements. The court specifically found: "The court agrees that an ongoing obligation of $20,000 is a material term of the contract. The court also agrees that the contract is terribly confusing and does not explicitly state that $20,000 will be required annually to maintain software and service support. [¶] Nonetheless, the evidence does not establish that Mr. Taylor was mistaken about the large annual fee." The statement of decision then set forth two pages of evidence supporting this finding. Accordingly, there is no merit to Subtronic's claim that the statement of decision is deficient with respect to the nature of the Advanced Data Management fee.

### *Mistake Justifying Rescission*

Subtronic claims the trial court also erred in ruling it failed to establish a mistake justifying rescission of the contract. While Subtronic concedes there were "annual charges for software subscription and maintenance," it asserts it mistakenly understood that the $15,000 "Advanced Data Management" fee was a one-time charge and not an annual fee.

Before considering Subtronic's claim, we set forth the general legal principles that govern contract interpretation and a claim of rescission based on unilateral mistake of fact.

" ' "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." [Citation.] "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." [Citation.] "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible. . . ." ' [Citation.] 'The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties.' " (*Horath v. Hess* (2014) 225 Cal.App.4th 456, 463–464 (*Horath*).)

" 'When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is "reasonably susceptible" to the interpretation urged by the party. If it is not, the case is over. [Citation.] If the court decides the language is reasonably susceptible to the interpretation urged, the court moves to the second question: what did

the parties intend the language to mean?  [Citation.]  [¶] Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself [citation] or from extrinsic evidence of the parties' intent [citation].'  [Citation.]  If a contract is susceptible to two different reasonable interpretations, the contract is ambiguous.  [Citation.]  A court must then construe that ambiguous contract language 'by applying the standard rules of interpretation in order to give effect to the mutual intention of the parties [citation].' "  (*Horath, supra,* 225 Cal.App.4th at p. 464.)

"On appeal, a 'trial court's ruling on the threshold determination of "ambiguity" (i.e., whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact.  [Citation.]  Thus[,] the threshold determination of ambiguity is subject to independent review.'  [Citation.]  If the contract language is determined to be ambiguous and conflicting extrinsic evidence was admitted on the meaning of that language, 'any reasonable construction will be upheld as long as it is supported by substantial evidence.' "  (*Horath, supra,* 225 Cal.App.4th at p. 464; accord, *Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC* (2020) 53 Cal.App.5th 807, 816–819.)

As to rescission, Civil Code section 1689 provides in part:  "A party to a contract may rescind the contract in the following cases:  [¶] (1) If the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party. [¶] (2) If the consideration for the obligation of the rescinding party

fails, in whole or in part, through the fault of the party as to whom he rescinds." (Civ. Code, § 1689, subds. (b)(1), (2).)

" 'A party may rescind a contract if his or her consent was given by mistake. [Citation.] A factual mistake by one party to a contract, or unilateral mistake, affords a ground for rescission in some circumstances.' [Citation.] [Civil Code] [s]ection 1577 defines 'mistake of fact' as 'a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in: [¶] 1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or, [¶] 2. Belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed.' " (*Greif v. Sanin* (2022) 74 Cal.App.5th 412, 438 (*Greif*).)

Subtronic claims the trial court erred in considering any extrinsic evidence, asserting the "sales quotation embodied the terms of the contract between Electro Scan, Inc. and Subtronic" and the quote did not say the Advanced Data Management fee was an annual payment. Subtronic relies primarily on Civil Code section 1625, which provides, "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

Civil Code section 1625 is part of the codification of the parol evidence rule, which also includes Code of Civil Procedure section 1856. (*Brawthen v. H & R Block, Inc.* (1972) 28 Cal.App.3d 131, 135.) Code of Civil Procedure section 1856 provides in part: "(e) Where a mistake or imperfection of the writing is put in issue by the pleadings, this section does not exclude evidence relevant to that issue. [¶] (f) Where the validity of the agreement is the fact in dispute, this section does not exclude evidence relevant to that issue.

11

[¶] (g) This section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates . . . or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, or to establish illegality or fraud." (Code Civ. Proc., § 1856, subds. (e)–(g).)

Thus, "[w]hen parties dispute the meaning of contractual language, the trial court must provisionally receive extrinsic evidence offered by the parties and determine whether it reveals an ambiguity, i.e., the language is reasonably susceptible to more than one possible meaning. If there is an ambiguity, the extrinsic evidence is admitted to aid the interpretative process." (*Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP* (2011) 201 Cal.App.4th 368, 376.)

On independent examination of the quote, we agree with the trial court that its language pertaining to the Advanced Data Management fee is ambiguous as to whether this was a one-time or annual fee. The footnote explaining the fee states it "provides unlimited access to GPM Infiltration Rate Calculations in the Critical Sewers Cloud Interface," but does not state it is a one-time fee. The footnote explaining the "ES Premium Support Services" indicates it "[r]epresents one (1) two[-]User Pack for Annual Subscription to www.CriticalSewers.com, Electro Scan Inc.'s Cloud Computing application to store, access, view, and export field date and reports. Includes all software upgrades and customer support from 8am–4pm, Pacific Standard Time, five (5) days a week. [¶] An additional 'per segment' charge will be incurred to provide separate District Council-specific data for access & delivery in a separate and secure environment, capable of third[-]party customer access." While, the language of the quote, especially footnote five, is unclear, it is reasonably susceptible to the interpretation that there would be an "Annual Subscription" required to access

12

www.CriticalSewers.com, as well as "Premium Support Services" for a two-user pack.  Indeed, Taylor testified he, himself, "got confused" when he looked at the quote "because of those notes with the numbers in parenthes[es]."

Subtronic also urges that the evidence does not support the trial court's conclusion that it failed to prove unilateral mistake sufficient to rescind the contract.  (See *Greif*, *supra*, 74 Cal.App.5th at p. 438.)

"On appeal from a judgment based on a statement of decision following a bench trial, we review the trial court's legal interpretation of the governing statutes de novo and the court's factual findings for substantial evidence. [Citations.] [¶] Substantial evidence review requires that we ' " ' "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings].  [Citations.]"  [Citation.]  We may not reweigh the evidence and are bound by the trial court's credibility determinations.  [Citations.]  Moreover, findings of fact are liberally construed to support the judgment.' " ' (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102 . . . ; accord, *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 334, . . . [' "questions as to the weight and sufficiency of the evidence, the construction to be put upon it, the inferences to be drawn therefrom, the credibility of witnesses . . . and the determination of [any] conflicts and inconsistencies in their testimony are matters for the trial court to resolve" ']; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 . . . [' "[w]hen two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court" '].)"  (*Espinoza v. Hepta Run, Inc.* (2022) 74 Cal.App.5th 44, 52.)  "A single witness's testimony may

13

constitute substantial evidence to support a finding." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

The trial court found that although the "ongoing obligation of $20,000 is a material term of the contract . . . [¶] . . . [t]he evidence does not establish that Mr. Taylor was mistaken about the large annual fee. The parties negotiated long and hard over the terms of the contract. All the defense-related parties testified credibly that it was always clear annual fees would be charged. Mr. Johnson's email to [Electro Scan] requesting a deal with Subtronic based on a $20,000 annual fee supports this. So does Mr. Grabowski's October 14 email indicating that Subtronic was aware of the annual fee but was unlikely to renew absent a job large enough to cover the cost. . . . [¶] Certainly[,] Mr. Taylor did not act shocked at receiving the November 2014 renewal notice. He did not put in writing his claim of mistake until June 2016. Instead, between late 2014 and mid-2016, Mr. Taylor attempted to re-negotiate the annual charge. The negotiation attempts implicitly recognized the legitimacy of the charge."

The evidence recited by the trial court amply supports its conclusion that Taylor knew, both before and after he agreed to the contract, that the $20,000 fee was annual rather than one-time.

## DISPOSITION

The judgment is affirmed. Costs on appeal to respondents.

14

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Margulies, J.

A159484, Subtronic v. Electro

15