[Civ. No. 15640. Second Dist., Div. One. June 19, 1947.]

HELEN E. YATES et al., Appellants, v. M. ESTELLA DUNDAS, as Special Administratrix, etc., Respondent.

P. E. Cavaney for Appellants.

Paul Vallee and Hugh Kelley for Respondent.

WHITE, J.—Plaintiffs have appealed from an adverse judgment in an action whereby they seek to quiet title to 12,250 shares of stock of Best Drinking Water Company. Their claim is based upon an asserted gift *causa mortis* evidenced by a written instrument executed by C. A. Dundas, now deceased, shortly prior to his death.

C. A. Dundas, who during his lifetime was president of The Best Drinking Water Company, a Nevada corporation doing business in Los Angeles, California, died on May 8, 1945. On April 30, 1945, while confined in a hospital with a serious illness, he executed in triplicate and delivered to each of the plaintiffs the following instrument:

"Agreement

"To Whom It May Concern:

"This is to certify that I, C.A. Dundas, as President of the Best Drinking Water Company, located at 308 North Oxford Avenue in the City and County of Los Angeles, State of California, do hereby wish to make the following considerations known, in case my capacity, as stated above, should be vacated, by an act of God, or by my death.

"This Company holds a permit issued by the Commissioner of Corporations of the State of California, on January 26th, 1945, and later amended on March 9th, 1945, said Permit number is 58218 S.F. In paragraph number three (3) of said permit there is a clause which states that shares of the Company stock will accure to me, and in consideration of services rendered previously to this time I hereby state that I want the persons whose names and addresses appear immediately below to have the number of shares of stock appearing immediately in front of their names, on an even basis as they accure to me until they satisfy amounts stated below.

"10,000 (Ten Thousand) Shares to: Mrs. Helen E. Yates, 693 Shatto Place, Los Angeles 5, California.

"2,500 shares (Two Thousand Five Hundred) Shares to: Richard P. and Allene Chitwood, 4067½ Oakwood Avenue, Los Angeles 4, California.

"This agreement is void and of no effect, as long as I remain the capacity above stated, but becomes effective in case anything should happen to me.

"Done this 30th day of April 1945 in the City and County of Los Angeles, State of California, in the capacity above set forth.

"C. A. Dundas

"President, Best Drinking Water Company."

By their complaints plaintiffs alleged that the foregoing instrument was executed and delivered by C. A. Dundas "with knowledge of the danger and nearness of his death," and that Dundas "said that he was making a gift of said stock mentioned in said agreement in consideration of services rendered previously to April 30, 1945, by the plaintiffs to said C. A. Dundas, and that said acts were all done with the intent and purpose of thereby giving, granting and transferring to plaintiffs all his right, title and interest in and to said stock made in view of death with the intent that it shall fully take effect in case of the death of the said giver, . . . ." By her

answer the defendant administratrix in effect denied that a gift had been accomplished and alleged that the estate of decedent was the owner of all stock that had been issued, and all rights to issuance of additional shares held in escrow pending performance of the conditions of the permits issued by the Commissioner of Corporations, and further, that "only 1358 shares of said stock have been issued or approved to be issued to the estate of said decedent under the terms of said permit, and insofar as the same can now be ascertained the said 1358 shares may be all that are ever issued at any time to said decedent or to his estate." Defendant administratrix further denied that there was any delivery of the stock and alleged that no delivery was possible under the terms of the permit. It was further charged that the instrument was obtained by duress, but no evidence was presented to support such charge and the trial court found it to be untrue.

Upon the trial plaintiff Richard P. Chitwood, called as a witness by the defense under section 2055 of the Code of Civil Procedure, identified stock ledger entries of Best Drinking Water Company, showing the issuance of certificate No. A for 1,358 shares to C. A. Dundas, on April 2, 1945, and a voting trust certificate, also to C. A. Dundas, for 2,535 shares, issued February 14, 1946, and testified that both such certificates were delivered to a Mr. Ellis, a San Francisco attorney, as escrow holder, pursuant to the terms of the permit granted by the Commissioner of Corporations. He further testified that he prepared the instrument here under consideration at the request of C. A. Dundas, who "said there wasn't anything in existence that would prove that he had promised me anything from that well," (the well from which Best Drinking Water Company secured its water) "and also Mrs. Yates anything, and he wanted it put up in writing as to what he had promised us, and asked me to make some sort of an agreement and bring it out there and he would sign it." On redirect examination he testified that Dundas said, "This agreement will take care of you and Helen in case anything happens to me, in case I die." With reference to the phrase in the instrument, "in consideration of services rendered previously to this time," Mr. Chitwood testified on cross-examination that the phrase was inserted at the request of Dundas; that he, Chitwood, "had rendered some services, yes"; "I came up here from San Diego, quit a job at Mr. Dundas' request to take over the well, and he promised at that time he would give me 1200 shares of his interest in the company;

. . . it wasn't a corporation at that time. . . . I kept the property at 308 North Oxford where this well was located and going to be formed into a corporation at his request until I could get it formed into a corporation. . . . I bottled water. Q. And you were paid for your services, were you? A. That is correct . . . $1.00 an hour. . . . Q. What other services did you perform besides bottling water prior to the date of April 30, 1945? A. That is all.''

The trial court found that C. A. Dundas executed and delivered the instrument hereinbefore quoted, and further found that ''The escrow instructions referred to in Paragraph III of the complaint are not and never have been in the possession of defendants, or any, or either of them. No one of plaintiffs has ever had the means of obtaining the possession or control of said stock, or any thereof. C. A. Dundas said he was making a gift of said stock mentioned in the aforesaid document in consideration of services rendered by plaintiffs to C. A. Dundas prior to April 30, 1945. The acts referred to in Paragraph III of the complaint'' (the execution and delivery of the instrument) ''were done with the intent and purpose of thereby giving, granting and transferring to plaintiffs all the right, title and interest of C. A. Dundas in and to said stock, and that they and each of them should fully take effect in case of the death of C. A. Dundas.''

The court then went on to find as follows:

''At all times herein mentioned, all of the shares of stock referred to in said agreement were held on deposit with an escrow holder pursuant to a permit of the Commissioner of Corporations of the State of California issued on the 3rd day of March, 1945. The said permit of the Commissioner of Corporations provided that all of said shares should be held as an escrow pending the further written order of the Commissioner and that the owners or persons entitled to said shares shall not consummate a sale or transfer of said shares, or any interest therein, or receive any consideration thereon, until the written consent of said Commissioner shall have been obtained so to do. The Commissioner of Corporations has never at any time issued any written or other order taking said shares or any thereof, out of said escrow. The Commissioner of Corporations has never given his written or other consent to the sale or transfer of said shares, or any interest therein, or his consent to the reception of any consideration thereon.''

The court further found that none of the shares referred to in the instrument had ever been delivered to plaintiffs.

As conclusions of law the court found that the instrument in question did not transfer any shares of stock to plaintiffs; that plaintiffs had no right, title or interest therein, and that the heirs of C. A. Dundas were the sole owners thereof.

Appellants' assignments of error are all based upon their contention that a valid gift *causa mortis* was effected by the execution and delivery of the instrument under consideration and that they are entitled to receive the shares of stock as and when they are released from escrow by the Commissioner of Corporations. Respondent, in support of the findings and judgment of the trial court, urges that the instrument is testamentary in character and not effective because not executed with the formalities of a will; that there was no valid gift because decedent did not surrender dominion of the subject of the gift; that under the terms of the permit issued by the Commissioner of Corporations decedent could not lawfully make a gift; and that there could be no valid gift without compliance with section 330.1 of the Civil Code, which provides that title to a stock certificate and the shares represented thereby can be transferred only by indorsement or assignment and *delivery* of the certificate.

The general rules with respect to the necessary elements of a gift *causa mortis* are well set forth in *Wakefield* v. *Wakefield,* 37 Cal.App.2d 648, 651, 652 [99 P.2d 1105], wherein appears the following:

". . . In *Braun* v. *Brown,* 14 Cal.2d 346 [94 P.2d 348], it was said:

" 'Section 1149 of the Civil Code defines a gift in view of death "as one, which is made in contemplation, fear or peril of death, and with intent that it shall take effect only in case of the death of the giver," and by section 1150 of the Civil Code a gift is presumed to be in view of death when made during the last illness of the giver or under circumstances which would naturally impress him with an expectation of speedy death. . . .'

". . . The gift *causa mortis* is discussed in *Noble* v. *Garden,* 146 Cal. 225 [79 P. 883, 2 Ann.Cas. 1001], where it is said:

" 'Gifts *donatio mortis causa* had their origin in the civil law, and were adopted with slight modifications into the common law. (*Ward* v. *Turner,* 2 Ves.Sr. 431.)

" 'Justinian defines a *donatio mortis causa* as "that which is made to meet the cause of death, as where anything is given

upon condition that, if any fatal accident befalls the donor, the person to whom it is given shall have it as his own; but if the donor should survive, or if he should repent of having made the gift, or if the person to whom it has been given should die before the donor, then the donor shall receive back the thing given" . . . (Thornton on Gifts, sec. 20, and cases cited.) It is there said: "But in a gift *causa mortis* a written instrument is not necessary; it may be and usually is made by parol, and the possession of the thing given must be absolutely delivered to the donee before the death of the donor and the donee. . . . The most characteristic mark of distinction between a legacy and such a gift is the change of possession. From the nature of the *donatio*, it is apparent that the infallible test which must distinguish it from a testamentary gift, is delivery, a change of dominion *in praesenti*. Without this there is really nothing to distinguish it from an ordinary testamentary bequest." '

"Also in *Stout* v. *McNab*, 157 Cal. 356 [107 P. 1005], the Supreme Court said:

" 'A gift in view of death must be as absolute in its terms, so far as the donor and donee are concerned, as a gift *inter vivos*. The difference between them is that the one is revocable by the giver and the other is not. A gift in view of death may be revoked at any time by the giver, and it is revoked by law upon his recovery from the illness, or escape from the peril, under the presence of which it was made. (Civ. Code, sec. 1151.) Gifts of any other kind cannot be revoked by the giver. (Civ. Code, Sec. 1148.) But the form of a gift in view of death is as absolute and unconditional as a gift *inter vivos*. *The title must pass to the donee at the time the gift is made and the donor must part absolutely with All control and with the title,* subject only to the condition imposed by law that it may be revoked, in which case the title is regained by the giver. (*Daniel* v. *Smith,* 64 Cal. [346] 349, [30 P. 575].' " (Emphasis added.)

In considering, first, the effect of the instrument executed by the donor, the language used in *Hart* v. *Ketchum,* 121 Cal. 426, 429 [53 P. 931], is pertinent: "It is essential to a gift *causa mortis* that the donor shall confer upon the donee, at the time of the gift, a present title and property in the thing given; and, if the thing given is capable of corporeal delivery, there must be an actual or symbolical delivery of it, or, if it is not so capable, the means of obtaining control and

possession of the thing must be then given. (Civ. Code, sec. 1147.) Unless the property in the thing given vests in the donee it remains in the donor, and there is only a purpose or intention on his part to make a gift. Such purpose, or intention, is incapable of enforcement. . . . if by the terms of the gift it is not to take effect until after the death of the donor, the disposal is testamentary and not a gift. Such limitation is a condition precedent by which the gift is prevented from becoming absolute in the lifetime of the donor, and the thing given is therefore a portion of his estate at the time of his death. . . ."

And in *Knight* v. *Tripp*, 121 Cal. 674 [54 P. 267], it is said:

"Gifts *causa mortis* are not regarded in the law with favor, since they are in contravention of the general rules prescribed for the testamentary disposition of property, and therefore should in all cases be established by clear and convincing proof of the requisites of such a gift. . . . and, while a gift *causa mortis* is testamentary to the extent that it is made in contemplation of death, and becomes absolute only upon the death of the donor, it is at the same time subject to the rules governing a gift *inter vivos*. The actual delivery of the thing given is made the substitute for the formal writing required for a testamentary disposition, but without such delivery the words of the donor are unavailing to constitute a gift. . . . There must be both a purpose to give and the execution of this purpose. The purpose must be expressed—either orally or in writing—and it must be executed by the actual delivery to the donee of the thing given, or of the means of getting possession and enjoyment thereof. . . ."

The instrument here under consideration does not contain apt language for the expression of a purpose to make a gift *causa mortis*—a gift taking effect *in praesenti*, subject only to revocation in the event of the donor's recovery from his illness. The decedent stated in the document: "I want the persons . . . to have the . . . shares of stock . . . as they accrue to me," and "this agreement is void and of no effect, *so long as I remain* in the capacity above stated, but becomes effective in case anything should happen to me." To us it appears plain that the instrument was wholly testamentary in character; that is, it was not to operate as a present transfer of title to the stock, but was to take effect only after his death. (*Nichols* v. *Emery*, 109 Cal. 323 [41 P. 1089, 50 Am. St.Rep. 43]; *Niccolls* v. *Niccolls*, 168 Cal. 444 [143 P. 712].)

It may be conceded that without the written instrument, a statement by decedent that he was making a gift, accompanied by a delivery of the stock certificates, whether indorsed or assigned, would constitute a valid gift, under the decisions. (*Crane* v. *Reardon,* 217 Cal. 531, 532 [20 P.2d 49]; *Estate of Escolle,* 134 Cal.App. 473, 480 [25 P.2d 860]; *Braun* v. *Brown,* 14 Cal. 2d 346, 350 [94 P.2d 348].) Such delivery may be actual physical delivery, or as in *Braun* v. *Brown, supra,* and many other cases, the requirement may be satisfied by delivery of the key to a safe deposit box containing the securities, or by delivery of other means of access to the property given, if it is not capable of manual delivery. But as heretofore indicated, the authorities uniformly hold that a gift *causa mortis* cannot be upheld without delivery of some nature, actual or symbolical. Appellants urge that the certificates being inaccessible, the execution and delivery of the instrument satisfies the requirements. But the instrument does not purport to be an assignment, a transfer *in praesenti* of the subject matter of the purported gift. *Francoeur* v. *Beatty,* 170 Cal. 740, [151 P. 123], is not in point, because in that case the gift was *inter vivos* and was accompanied by a formal and unconditional instrument of transfer. In *Lynch* v. *Lynch,* 124 Cal.App. 454 [12 P.2d 741], the gift was also *inter vivos,* and it was held that a transfer of the stock on the books of the corporation and issuance of a new certificate in the name of the donee was sufficient. C. A. Dundas, the donor in the present case, did not divest himself of title and part with all dominion over the stock, but so long as he remained alive he retained such control as he had theretofore had, subject to the terms of the permit of the Commissioner of Corporations, and appellants acquired no title and had no means of securing possession of the stock certificates.

In view of the conclusions herein reached, it becomes unnecessary to consider other points made by respondent in support of the judgment.

The judgment is affirmed.

York, P. J., and Doran, J., concurred.