Filed 10/4/13  Lee v. Kim CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION EIGHT

| | |
|---|---|
| IN SOON LEE et al., | B244796 |
| Plaintiffs, Cross-defendants and Respondents, | (Los Angeles County Super. Ct. No. BC 393375) |
| v. | |
| ANNA LEE KIM, | |
| Defendant, Cross-complainant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, William F. Fahey, Judge.  Affirmed.

The Law Office of Benjamin Blakeman and Benjamin Blakeman for Defendant, Cross-complainant and Appellant.

Dale J. Park for Plaintiffs, Cross-defendants and Respondents.

\* \* \* \* \* \*

This case involves a dispute between mother, plaintiff In Soon Lee (Lee), and daughter, defendant Anna Lee Kim (Kim). The dispute is over membership interests in a limited liability company (LLC) called SNI Holdings, LLC (SNI). Lee brings this suit to obtain Kim's membership interest in SNI because she contends Kim wrongfully took the interest from her. Although Lee maintains she was always the actual "owner" of SNI, the SNI operating agreement named one of her sons as the sole member of the LLC. Her theory at trial was that her son held SNI in trust for her. Kim brings a cross-complaint against Lee and SNI for Lee's alleged mismanagement of SNI.

After a two-day bench trial, the court entered judgment for Lee on Lee's fourth amended complaint (complaint) and for Lee and SNI on Kim's first amended cross-complaint (cross-complaint). Kim contends Lee has no standing and also raises insufficiency of the evidence challenges. Further, she asserts we must reverse the judgment against her on her cross-complaint, if we reverse the judgment for Lee on the complaint. We affirm.

## FACTS AND PROCEDURE

### 1. Complaints

The operative complaint alleges Lee purchased commercial real property at 11224 Western Avenue in Los Angeles to generate retirement income. Lee established SNI and purchased the property through SNI. Although she was the manager of SNI, she chose her oldest son, Sea Kwang Lee (Sea Kwang),[1] to be the sole member of SNI. Sea Kwang understood Lee wholly owned SNI, and he allegedly agreed to hold his ownership interest in SNI in a revocable trust for the benefit of Lee. The complaint alleges Lee became gravely ill in 2006 and believed she was going to die. Kim allegedly persuaded Lee to visit a trust and estates lawyer and convey equal interests in SNI to four of her children. As a result, Lee instructed Sea Kwang to terminate the trust and give himself and three of his siblings,

---

[1] To distinguish between plaintiff Lee and the various other members of the Lee family, we will use the first two names of other family members. We do not intend this informality to reflect a lack of respect. Also, we note the spelling of Sea Kwang's name is inconsistent in the record. He is sometimes referred to as Sea Kwang and sometimes as Sea Gwang. We will consistently use Sea Kwang.

2

including Kim, a 25 percent interest in SNI each. All of them, including Kim, allegedly agreed to return their interests to Lee if she demanded them back. Lee had several surgical operations and survived her illness. She instructed her children to return their interests in SNI to her, which three of them allegedly did. Kim was the only one who refused. Lee then filed the instant lawsuit against Kim. The complaint alleges causes of action against Kim for gift *causa mortis*,[2] undue influence, fraud, breach of contract, promissory estoppel, and financial elder abuse. Kim cross-complains against Lee and SNI based on Lee's alleged mismanagement of SNI. She alleges causes of action for an accounting, breach of fiduciary duty, and injunctive relief, and seeks the dissolution of SNI and the appointment of a receiver.

This is the second appeal in this matter. In 2010, we filed a nonpublished opinion in which we reversed the trial court's judgment after it sustained Kim's demurrer to the second amended complaint without leave to amend. (*Lee v. Kim* (Feb. 8, 2010, B217381).) We remanded the matter to permit Lee to file a third amended complaint.

## 2. Trial

The court held a two-day bench trial in this matter. Right before trial commenced, Lee dismissed her causes of action for gift *causa mortis*, undue influence, breach of contract, and promissory estoppel. Her causes of action for fraud and financial elder abuse remained. We summarize the testimony and relevant exhibits in the following subparts.

### a. Lee's Testimony

Lee is over 71 years old. She was born in Korea and attained a Korean middle school education, which included nine years of schooling. She came to the United States in 1990 and became a citizen in 2002. She has five children ranging in age from 42 to 51 years old. Kim is her eldest child. Her husband passed away in 1997, and she has not remarried. Lee is a licensed acupressurist. She operated a business in Torrance where she provided acupressure. Lee does not speak or read English.

---

[2] A gift *causa mortis* is a gift made "in view of impending death" and with the "intent that it shall be revoked if the giver recovers from the illness or escapes from the peril." (Prob. Code, § 5702, subd. (a); see *Yates v. Dundas* (1947) 80 Cal.App.2d 468, 472.)

In 2004, an attorney helped Lee form SNI. Lee formed SNI upon her attorney's advice to help her generate retirement income. Lee purchased commercial real property in 2004 through SNI. SNI is the owner of the property according to the grant deed. SNI leases that property to a Carl's Jr. restaurant. The restaurant pays $8,900 per month in rent. This is the income Lee intended for her retirement. Lee paid for the property with her own money. She bought it for approximately $1.5 million. She borrowed $700,000 and paid the balance of the purchase price in cash. SNI is identified on the paperwork as the borrower of the loan, and Lee is identified as the personal guarantor of the loan. Lee signed the loan agreement and various other loan-related documents on behalf of SNI as its "member."

Lee operates SNI herself. However, her attorney advised her to put SNI in the name of the person she trusted most, not her own name. Her attorney suggested this because Lee apparently felt "in danger" from some potential creditors. The person Lee trusts most is her son, Sea Kwang. She asked Sea Kwang to "use" his name for the LLC. He "happily" agreed to the arrangement and told her he did not think SNI was his own property. The SNI operating agreement identifies Sea Kwang as the sole member of SNI, holding 100 percent membership interest in the LLC. The operating agreement identifies Lee as the manager of the LLC. Somewhat confusingly, Lee signed the operating agreement as "member" and Sea Kwang signed it as "sole member." Lee describes herself as the true "owner" of SNI, having only "borrowed" her son's name. Her attorney told her Sea Kwang was only the "nominal" owner and she had "every right" in and the "whole responsibility" for the LLC. The agreement Lee had with Sea Kwang to hold SNI for her benefit was oral, not in writing.

In 2006, Lee became ill. She developed a liver ailment, and the doctor told her it was possible she could have only three months to live. She suffered from back pain and could not eat well. She had a liver surgery in May 2006. Thinking she was going to die, before her surgery she prepared a handwritten will leaving her property to her five children ("five brothers and sisters") in equal parts, if she died. The will stated her children were to "equally share Carl's Jr.," among her other property. The will is dated May 20, 2006. She placed four copies of the will in different places throughout her home.

After her surgery, she continued to have problems eating and she also developed shoulder pain. She could not lie down for almost a month because of the pain. She had several shoulder surgeries, the first one around December 19, 2006.

Late in 2006, Kim picked up Lee and took Lee to her home. Lee told Kim she could not move because she was still in pain and she could not walk that well, so Kim took her in a wheelchair. At Kim's home, Kim showed Lee a copy of a book in Korean called "Basics of Estate Planning and Living Trust." She also told Lee about some articles she had read dealing with siblings fighting over parents' estates. Lee told Kim she had written a will. Kim said the will "was not useful" and Lee should have a lawyer prepare the appropriate legal paperwork for her to divide her assets equally among her children. Kim told her an informal, hand-written will was not official. Kim contacted an attorney for Lee. Around December 6, 2006, Kim arrived at Lee's home and told her she had an appointment with an attorney, Grace Kim (Attorney Kim).[3] Lee did not know until Kim arrived that she had an appointment. She still could not move well and had to go in a wheelchair. Kim took Lee's documents relating to SNI and brought them to the appointment. Kim told Lee she was going to hold the documents temporarily because "there [was] a big inspection by the government" and Lee "was not supposed to hold" them. Kim also told Lee to write the attorney a check for "the division of the inheritance," and Lee did so. Lee told the attorney she wanted all of her property during her lifetime, and after her death, each of her children should get one-fifth of it.

On December 13, 2006, Kim took Lee to a second appointment at the attorney's office. The attorney presented papers for Lee to sign. Her children were at the meeting, except her youngest one (a son), who lives in Korea. Lee saw her youngest child's name was not on the paperwork and asked why he was not on it, because she wanted her property to be divided equally among all the children. Kim told her they would add him later on because it was complicated to include his share when he was not here in the United States.

No one explained to Lee the legal effect of the documents that were being signed that day. Nor had any of them been translated into Korean for her. It was not Lee's intention to

---

**3** Attorney Kim is not related to defendant Kim.

5

give her assets to the four children present and dispose of those assets forever. She continued to operate SNI by herself after the December 2006 meetings with Attorney Kim. Her children did not ask to participate in the operation of SNI or demand any profits from the operation of SNI between December 2006 and March 2008.

In March 2008, Lee tried to refinance the loan on the Carl's Jr. property. The bank told her she did not have the right to do that because SNI was in her children's names. This was the first time she learned SNI was in the names of her four children. She was very confused and surprised. She met with her children and asked why they took the interests in SNI because she never said she would give it to them while she lived. Sea Kwang and her second daughter, Young Jin Lee, said they did not consider SNI theirs while she was living, given that she told them she was leaving it to them when she passed. Sea Kwang, Young Jin, and a third son, Sae Kun Lee, transferred their interests in SNI to Lee. Lee was still unable to refinance her loan because Kim refused to transfer her interest in SNI to Lee.

### b. Attorney Kim's Testimony

Attorney Kim was initially retained to review the SNI operating agreement in early December 2006. She believes Lee asked her to review the agreement but Kim may have made the appointment. Lee, Kim, and Sea Kwang came to this initial appointment when she reviewed the agreement. They then asked her to prepare a document transferring 75 percent of Sea Kwang's interest in SNI to three of his siblings equally. Lee instructed Sea Kwang to make the transfer. The SNI operating agreement required the manager's consent to the addition of new members. Attorney Kim thus prepared a "Unanimous Written Consent" (UWC) transferring 25 percent membership interests to Sea Kwang's three siblings. The UWC was signed by Sea Kwang as the "sole member" of SNI and Lee as the "manager" of SNI. Lee never asked her to prepare a will or a trust. Attorney Kim explained what the UWC said to Lee, though she did not advise Lee of the legal significance of the document. They did not ask her to create a life estate in SNI for Lee and give the remainder to her children upon her death, but she could have done that if they had asked for it. She did exactly what they asked. She believed there was an agreement among the family members that they had reached before coming to the appointment with her. They may have told her

6

Lee was doing this because Lee believed she was going to die, but she does not remember. She does not recall any reference to a fifth child in Korea.

Attorney Kim "knew 99 percent" that SNI actually belonged to Lee and she was the "de facto owner," not Sea Kwang, because he took his mother's direction and submitted to her with respect to SNI. She described this as a "common scenario" in the Korean community for parents to have their children be the owners on paper while the parents are the de facto owners.

### c. Sae Kun's Testimony

As mentioned above, Sae Kun is one of Lee's sons and thus Kim's brother. In 2006, he recalls Lee had critical medical conditions, and he felt "very strongly" she would die. His mother had telephoned him and said she was going to die and she wanted to share her will with her children. She was very sick and he felt she had maybe given up on life. He attended the meeting with his mother, his siblings, and the attorney in December 2006. He saw his brother and mother sign a document giving him and his siblings a 25 percent interest each in SNI. After the meeting, he knew he held 25 percent of SNI, but he thought it "mean[t] nothing" and was not his until "something happen[ed]" to his mother. He received the 25 percent interest because of her medical conditions and their belief that she was going to die. At Attorney Kim's office, Lee told him and his siblings they would get their shares in SNI after she died.

His mother contacted him sometime before June 2008 and asked him to return his interest in SNI because her health had improved and the situation had changed. He signed a document returning his interest.

### d. Defendant Kim's Testimony

Prior to 2006, Kim did not have much of a relationship with Lee. Lee showed up at her house sometime in late November or early December 2006. Lee told her for the first time about SNI and said she wanted to give it to her four of her children equally. Lee said she wanted to give Kim more than 25 percent, but she had to distribute it equally. Lee never mentioned her fifth child in Korea. Kim denied showing Lee any articles or books about estate planning or fights among siblings over parents' estates.

7

Lee said Sea Kwang owned SNI, and through it he owned a building with Carl's Jr. as a tenant. Kim did not ask Lee how she could give Sea Kwang's property away. Kim believed Lee could do whatever she liked with the property, though.

Kim did not schedule any meetings with Attorney Kim. She thought Lee scheduled the appointments with Attorney Kim herself; Lee told her about the appointments. She went to the appointment with Lee and her siblings on December 13, 2006. The attorney asked Lee and Sea Kwang for the documents relating to SNI, and they gave them to her. She saw Lee and Sea Kwang sign the document transferring the 25 percent interests to her, Young Jin, and Sae Kun. She did not hear anyone mention during the meeting that Lee was afraid she was going to die. Nor did she hear anyone mention during that meeting that Lee was actually the true owner of SNI, not Sea Kwang. Attorney Kim merely told them Sea Kwang was 100 percent owner of SNI and was making a "gift" of 25 percent to each of his siblings present at the meeting.

Sometime in 2008, Lee asked her to return her 25 percent interest in SNI; Lee said SNI belonged to her 100 percent and she had changed her mind. Kim did not want to return her interest. Instead, Kim asked for her share of the income from SNI.

### 3. *Trial Court's Final Statement of Decision*

The bench trial took place on June 18 and 19, 2012, and the court filed its final statement of decision on August 2, 2012. The trial court recognized Lee had dismissed all but her fraud and financial elder abuse causes of action, but concluded it could amend the complaint to conform to proof, and the proof at trial established a gift *causa mortis*. The court also concluded Lee had proven her fraud cause of action. It found the evidence established Kim had misled Lee into thinking the UWC only provided an estate plan while Lee was very sick, and Kim "had no intention of relinquishing her interest in SNI should her mother not die." The court further found Sea Kwang held SNI in a revocable trust, with Lee as the settler and sole beneficiary of the trust, and Lee directed her son as trustee to make a gift *causa mortis* of SNI to her other children. The court held Lee had standing as settler and sole beneficiary to sue Kim for damage to trust property. The court also concluded Lee proved financial elder abuse and, alternatively, undue influence. Finally, the court

8

concluded Kim failed to prove the causes of action in the cross-complaint. She based the cross-complaint on the notion that Sea Kwang irrevocably transferred 25 percent of SNI to her, which theory the court rejected.

The court entered judgment for Lee on the complaint and for Lee and SNI on the cross-complaint. The judgment ordered Kim to "restore[]" her 25 percent interest in SNI to Lee. It also ordered Kim to pay Lee's attorney's fees of $56,600. Kim timely appealed.

## DISCUSSION

### 1. Standing

To prevail in this case, Lee had to prove she had some interest in SNI she was entitled to recover from Kim. All of her causes of action are founded in some way on the notion that she "owned" SNI and Kim took it from her and refused to return it, whether the taking was through fraud, undue influence, or financial elder abuse. Under the Beverly-Killea Limited Liability Company Act, an LLC consists of "members" who own membership interests. (Corp. Code, §§ 17000, 17001, subds. (x), (z), 17050, subd. (b); 9 Witkin, Summary of Cal. Law (10th ed. 2005) Partnership, § 136, p. 697.) Thus, Lee needed to overcome the fact that the SNI operating agreement named Sea Kwang as the sole member of SNI who held 100 percent interest in the LLC. Lee's theory in the complaint was that Sea Kwang orally agreed to hold his 100 percent membership interest in SNI in a revocable trust for the benefit of Lee. In a trust, the trustee holds legal title to the trust property while the beneficiary holds equitable title. (*Gonsalves v. Hodgson* (1951) 38 Cal.2d 91, 98.) Lee intended the allegations of an oral trust to overcome the fact that, on paper, Lee did not "own" SNI.

Lee's oral trust theory leads inevitably to the question of standing, a threshold issue all plaintiffs must consider to maintain a cause of action. (*Martin v. Bridgeport Community Assn., Inc.* (2009) 173 Cal.App.4th 1024, 1031.) The trial court concluded Sea Kwang held SNI in a revocable trust with Lee as the settlor and sole beneficiary of the trust, and Lee had standing to sue for damage to trust property as settlor and sole beneficiary of the trust.

Kim contends the court erred in holding Lee had standing. The creation of a trust is a question of fact, and we review this finding for substantial evidence. (*Monell v. College of*

9

*Physicians & Surgeons* (1961) 198 Cal.App.2d 38, 48.) We review de novo the legal conclusion that Lee's status as settlor and sole beneficiary of the trust conferred standing. (*T.P. v. T.W.* (2011) 191 Cal.App.4th 1428, 1432.) We conclude the evidence sufficiently established an oral trust. Moreover, Lee had standing as a beneficiary of the trust under the particular facts of this case.

### a. Oral Trust

As pertinent here, the owner of property may create a trust when the owner transfers it to another person as trustee during the owner's lifetime. (Prob. Code, § 15200, subds. (a), (b).) The settlor must properly manifest an intention to create the trust. (Prob. Code, § 15201.) Oral trusts of personal property are permissible, though the oral declaration of the settlor standing alone is insufficient to show the creation of an oral trust. (Prob. Code, § 15207, subd. (b).) A party must establish the existence and terms of an oral trust by clear and convincing evidence. (*Id.*, subd. (a).) "In general, a settlor may manifest the intention to create a trust by written or spoken words, or by conduct. [Citation.] The settlor is not required to use the words 'trust' or 'trustee.'" (*Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP* (2011) 201 Cal.App.4th 368, 379-380.)

A party may prove an oral trust in personal property by parol evidence.[4] (*Estate of Gardner* (2010) 187 Cal.App.4th 543, 552.) Thus, where "a writing purports to make an absolute transfer, extrinsic evidence may be offered of a collateral agreement to hold the property . . . in trust." (*Estate of Gaines* (1940) 15 Cal.2d 255, 265.) Our Supreme Court has described this rule as an exception to the parol evidence rule. (*Ibid.*) Kim contends parol evidence of an oral trust is not admissible because the SNI agreement expressly provides the members will hold their interests for their "own account only" and "[n]o other person will have any direct or indirect beneficial interest in or right to the Membership Interest." (*Hansen v. Bear Film Co.* (1946) 28 Cal.2d 154, 174-175 ["'[E]xtrinsic evidence is not admissible to show that the grantor intended that the grantee should hold the property

---

[4] A membership interest in an LLC constitutes personal property of the member. (Corp. Code, § 17300.)

upon trust, if the instrument of transfer clearly states that he is to hold the property for his own benefit, free of trust.'"]; see Rest.3d Trusts, § 21, subd. (1)(a), p. 321.)

But, as Lee points out, evidence of mistakes is another exception to the parol evidence rule. Even when an instrument states the transferee takes the property for his or her own benefit, extrinsic evidence that this was a mistake or imperfection in the writing is admissible. (Code Civ. Proc., § 1856, subd. (e); Rest.3d Trusts, § 21, subd. (1)(a), com. (a), pp. 321-322.) "When, through . . . mistake . . . , a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded." (Civ. Code, § 1640.) We may reform the written contract so as to express the true intention of the parties when there is a mutual mistake. (*Id.*, § 3399; *PV Little Italy, LLC v. MetroWork Condominium Assn.* (2012) 210 Cal.App.4th 132, 152 ["There are, of course, instances when the parties mutually intend one thing, but due to mistake or inadvertence, the written document does not reflect that intent. In that instance, the law permits the court to reform the document consistent with the parties' intent."].)

"In determining whether a mutual mistake has occurred, a court may consider parol evidence. [Citation.] Such evidence is admissible to show mutual mistake even if the contracting parties intended the writing to be a complete statement of their agreement. [Citation.] 'It is the rule that, where the writing itself, through mistake, does not express the intention of the parties who entered into it . . . and the writing does not therefore contain the real contract between the parties, the objection as to parol evidence is without merit.' [Citation.] Extrinsic evidence is necessary because the court must divine the true intentions of the contracting parties and determine whether the written agreement accurately represents those intentions." (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 525.)

In this case, there was substantial evidence that the provision of the SNI agreement stating members held their interest for their own benefit was a mistake or imperfection in the writing, and the parties' true intentions were that Sea Kwang hold his interest in trust for Lee. Lee testified she formed SNI to help her generate retirement income. SNI was the owner of commercial real property Lee purchased with her own funds and a loan she personally guaranteed. This property generated rental income for her retirement. She

11

formed SNI on the advice of her attorney. The attorney also advised her to make a person she trusted the sole member of the LLC, but that person would be the "owner" of the LLC in name only, while Lee would be the de facto owner. Lee asked Sea Kwang, the person she trusted most in the world, to lend his name as the nominal owner, and he happily agreed to the arrangement. He told her he did not believe the LLC was his property, and clearly Lee did not think this either. From the evidence, the two mutually understood he was holding the LLC membership interest for her benefit, and they did not intend to vest any beneficial interest in SNI in Sea Kwang. Although Lee did not expressly use the term "trustee" in her testimony, that was not required. The evidence supported an oral trust with the SNI membership interest constituting the trust property, Sea Kwang as the trustee, and Lee as the beneficiary on whose behalf Sea Kwang held the property. By contrast, there is no evidence Sea Kwang, in practice, held the membership interest for his own benefit. Lee collected the rental income from the property owned by SNI, not Sea Kwang. Sea Kwang did whatever Lee directed with regard to SNI. Even Attorney Kim knew almost to a certainty that Lee was the de facto owner of SNI because she observed how Sea Kwang took Lee's direction regarding SNI, and this was a common arrangement between children and parents in the Korean community.

In all, substantial evidence supported the creation of an oral trust, and the trial court did not err when it disregarded the provision of the SNI agreement stating members hold their interests for their own benefit.[5] Looking at the surrounding circumstances, the parties did not intend Sea Kwang to hold his interest for his own benefit, and the provision was thus a mistake or imperfection in the writing.

---

[5] It matters not that the trial court did not expressly discuss the parol evidence rule in its statement of decision. We presume the trial court's judgment was correct and indulge all intendments and presumptions in favor of its correctness. (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610.) Further, if the trial court's result was correct on any theory of law applicable to the case and supported by the record, we will affirm, whether the trial court gave the correct reasons or not. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.)

## b. Lee's Standing as Trust Beneficiary

Kim asserts even if Lee proved her oral trust theory, she has no standing to sue as beneficiary of the trust. It is generally true that the trustee of a trust is the "real party in interest" in litigation involving trust property, while the beneficiary of the trust, having no legal title or ownership interest in the trust property, is not the real party in interest and may not sue for damage to trust property. (*Presta v. Tepper* (2009) 179 Cal.App.4th 909, 914; *Nicholson v. Fazeli* (2003) 113 Cal.App.4th 1091, 1102; *Wolf v. Mitchell, Silberberg & Knupp* (1999) 76 Cal.App.4th 1030, 1036.) Like many general rules, however, there are exceptions. One of those is applicable here.

A beneficiary has standing against a third party in a proceeding for damage to trust property when "the beneficiary is in possession, or entitled to immediate distribution, of the trust property involved." (Rest.3d Trusts, § 107, subd. (2)(a), p. 102; see also *Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP, supra*, 201 Cal.App.4th at p. 379 [California trust law is derived from the Restatement and we may therefore look to the Restatement for guidance].) This exception may apply whenever the action concerns third party liability, such as when a third party tortiously takes trust property or interferes with its use. (Rest.3d Trusts, § 107, com. a, p. 102.) Thus, on termination of the trust, a beneficiary who possess the trust property, or who is entitled to distribution of it, may sue a third party "who has damaged that property or interfered with its delivery to the beneficiary." (*Id.*, com. (c)(1), p 103.)

Lee effectively terminated the trust with Sea Kwang when she directed him to convey his membership interest in SNI to her. He did not hold a legal interest in SNI after the conveyance, and with Lee holding both his legal interest and her equitable interest as beneficiary, there was no longer any purpose in keeping the trust relationship alive. (Prob. Code, § 15407, subd. (a)(2); *Zakaessian v. Zakaessian* (1945) 70 Cal.App.2d 721, 724.) She possessed a 75 percent membership interest in SNI after her other children, all but Kim, conveyed their interests to her at her direction. As a beneficiary in possession of the majority of the trust property, she had standing to sue the person who she alleged had

13

tortiously taken the trust property or was interfering with the proper delivery of the remaining trust property.

## 2. *Trial Court's Amendments to Conform to Proof*

Kim next contends the trial court erred when it added two of Lee's dismissed causes of action back into the mix as amendments to conform to proof. We do not agree the trial court erred.

"It is of course settled that the allowance of amendments to conform to the proof rests largely in the discretion of the trial court and its determination will not be disturbed on appeal unless it clearly appears that such discretion has been abused. [Citations.] Such amendments have been allowed with great liberality 'and no abuse of discretion is shown *unless by permitting the amendment new and substantially different issues are introduced in the case or the rights of the adverse party prejudiced* [citation].' (Italics added.)" (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31; see Code Civ. Proc., § 469.)

Kim claims the court had no power to consider the dismissed causes of action because it should have dismissed them with prejudice under Code of Civil Procedure section 581, subdivision (d). That section provides in pertinent part: "[T]he court shall dismiss the complaint, or any cause of action asserted in it, in its entirety or as to any defendant, with prejudice, when upon the trial and before the final submission of the case, the plaintiff abandons it." (Code Civ. Proc., § 581, subd. (d).) "A trial shall be deemed to actually commence at the beginning of the opening statement or argument of any party or his or her counsel . . . ." (Code Civ. Proc., § 581, subd. (a)(6).) Here, Lee dismissed her causes of action not "upon the trial and before the final submission of the case," but before opening statements commenced. Subdivision (d) of section 581 does not apply. The operative rule is section 581, subdivision (c), which provides a plaintiff may dismiss any cause of action "with or without prejudice prior to the actual commencement of trial." There is no indication in the record Lee voluntarily dismissed her causes of action with prejudice. Her counsel simply stated she was dismissing them. There is also no indication in the record the court dismissed them with prejudice or entered a judgment of dismissal with respect to those

14

causes of action. Under these circumstances, we cannot say the causes of action were or should have been dismissed with prejudice.

Moreover, the court did not abuse its discretion in amending to conform to proof of two dismissed causes of action (gift *causa mortis* and undue influence). The amendment did not introduce new and substantially different issues into the case. The causes of action were part of the case until right before trial. The parties should have been familiar with the issues raised by them and prepared for trial on them. Additionally, the dismissed and undismissed causes of action were all interrelated and arose from the same operative facts. Kim asserts she was prejudiced by the addition of the gift *causa mortis* cause of action, in particular, because she was not given a chance to rebut Lee's testimony about her failing health and her belief she was going to die. This is because Kim purportedly had Lee's doctor under subpoena but released him when Lee dismissed the gift *causa mortis* cause of action. First, the record demonstrates Kim had an opportunity to rebut Lee's testimony insofar as she cross-examined Lee and Lee's witnesses about her health, and Kim testified about Lee's health as well. Second, although Lee was clearly proffering evidence regarding her health, Kim did not advise the court of her absent doctor witness or request an opportunity to subpoena and call him. The first mention of the doctor witness in the record comes weeks after the trial concluded, when Kim filed objections to the court's tentative statement of decision. Any prejudice to Kim's case from the missing doctor testimony was of her own making and was not the result of a court error. The court did not err in amending the complaint to conform to proof.

### 3. *Sufficiency of the Evidence of Gift* **Causa Mortis***, Undue Influence, and Fraud*

Kim contends the evidence was insufficient to support the court's finding for Lee on the gift *causa mortis*, undue influence, and fraud causes of action. We reject this argument and hold substantial evidence supported the judgment.

15

Consent to a gift is not free when induced by undue influence. (Civ. Code, § 1567, subd. (4).)[6] The gift may be rescinded when the donee obtained the donor's consent through undue influence. (Civ. Code, §§ 1566, 1689, subd. (b)(1); 13 Witkin, Summary of Cal. Law, *supra*, Personal Property, § 152, p. 165.) Undue influence occurs when one party imposes confidence in another, and that other uses such confidence "for the purpose of obtaining an unfair advantage" over the first party. (Civ. Code, § 1575, subd. (1).) It also occurs when one takes "a grossly oppressive and unfair advantage of another's necessities or distress." (*Id.*, subd. (3).)

"What constitutes undue influence and what constitutes sufficient proof thereof depend upon the facts and circumstances of each particular case. It 'is a species of constructive fraud which the courts will not undertake to define by any fixed principles, lest the very definition itself furnish a finger-board pointing out the path by which it may be evaded.'" (*Sparks v. Sparks* (1950) 101 Cal.App.2d 129, 135.) Undue influence "is a shorthand legal phrase used to describe persuasion which tends to be coercive in nature, persuasion which overcomes the will without convincing the judgment." (*Odorizzi v. Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 130.) It "involves the use of excessive pressure to persuade one vulnerable to such pressure, pressure applied by a dominant subject to a servient object. In combination, the elements of undue susceptibility in the servient person and excessive pressure by the dominating person make the latter's influence undue, for it results in the apparent will of the servient person being in fact the will of the dominant person." (*Id.* at p. 131.) The vulnerability of the weaker party "need not be longlasting nor wholly incapacitating, but may be merely a lack of full vigor due to age [citation], physical condition [citation], emotional anguish [citation], or a combination of such factors." (*Ibid.*)

Lee proffered substantial evidence of undue influence here. Kim, as Lee's daughter, occupied a position of confidence with respect to Lee. (*Sparks v. Sparks, supra*, 101 Cal.App.2d at p. 135 [the law will infer special confidence from certain relations, including

---

**6** Although this chapter of the Civil Code speaks in terms of consent to contracts, the rules are equally applicable to cases of gifts. (*Estate of Truckenmiller* (1979) 97 Cal.App.3d 326, 330-331 & fn. 1.)

parent and child].)  The evidence showed she used that confidence to obtain an unfair advantage in securing an interest in SNI.  It also showed she took unfair advantage of Lee's necessities or distress.

Before December 2006, Lee did not indicate a desire to make a gift of SNI to her children.  She originally formed SNI for purposes of retirement income in 2004.  If she intended the property to generate income for her during her lifetime, it would make little sense for her to give it away while she was living.  She became very concerned about her mortality in 2006 when she had a liver ailment requiring surgery.  She thought she might die.  She was distressed enough that, before her surgery, she drafted a holographic will leaving her property -- including SNI, which she referred to as "Carl's Jr." -- in equal parts to her five children, but only upon her death.

Sometime in December 2006, Kim started to exert undue pressure on Lee, who was weakened from illness and distressed about her health.  Sae Kun remembers he felt strongly his mother might die around this time, and he felt she had perhaps given up on life.  Around this time, Kim arrived at Lee's house and took Lee to her home.  Lee was not in good condition.  Although she had already had the liver surgery, she had problems eating and resting.  She could not lie down because she had developed severe shoulder pain, a condition for which she would eventually have several surgeries.  She could not move or walk well.  Nevertheless, Kim put Lee in a wheelchair and took her to Kim's home.  There, she showed Lee articles about siblings fighting over deceased parents' estates.  She also showed her a book in Korean about estate planning.  Lee then told Kim she already had a will.  Kim insisted the will was no good and she needed visit an estate planning attorney for the appropriate paperwork.

Kim was the one who chose the attorney, made the appointments for Lee, and took Lee there each time.  But Lee went to see the attorney only because Kim told her she needed something other than the holographic will.  It does not appear Lee ever had a conversation with the attorney without Kim present.  Lee apparently trusted Kim and trusted that she would help her obtain the right paperwork to leave her property to her children only upon her death.  Lee signed the UWC, but no one explained the legal effect of the document.

17

Attorney Kim said she explained to Lee what the UWC said (because there was no Korean translation prepared, and Lee does not read English), but she did not explain the legal significance of the document. These facts paint a picture of an elderly woman who was in poor health and distressed about the possibility of death and who was susceptible to the undue pressure of a trusted family member. That family member used the situation to compel Lee to change her estate plan so that she gifted away property she had always intended to keep for her retirement.

Kim repeatedly asserts there can be no revocation by Lee of a gift Sea Kwang made. That Sea Kwang was the one who formally gifted away the interests in SNI is of no consequence. As we explain in part 1. of the Discussion, Lee established Sea Kwang was merely trustee of a trust for which she was settlor and beneficiary, and she had standing to pursue return of the trust property. Sea Kwang, as trustee, had a duty to comply with her directions as settlor of the trust. (Rest.3d Trusts, § 74, subd. (1)(a), pp. 23-24.) When he signed the UWC transferring interests in SNI to his siblings, he was only acting at Lee's direction and as her trustee. As a result, it was Lee's consent to the transaction that mattered.

In sum, Lee proved undue influence with substantial evidence and is thus entitled to rescind Kim's interest in SNI. This constitutes a proper basis for the trial court's judgment finding for Lee on the complaint and ordering Kim to return her 25 percent interest in SNI. We need not address Kim's insufficiency of the evidence challenges to the fraud and gift *causa mortis* causes of action. Even if she were correct as to these, the undue influence finding would still support the judgment, and reversal would not be appropriate.

## 4. *Financial Elder Abuse*

The financial elder abuse cause of action was the basis for the award of attorney fees in the judgment. Kim contends we must reverse the attorney fee award because Lee did not prove financial elder abuse. We disagree.

As pertinent here, financial elder abuse occurs when a person "[t]akes, secretes, appropriates, obtains, or retains" any property right of an elder adult "for a wrongful use," "with intent to defraud," or "by undue influence." (Welf. & Inst. Code, § 15610.30, subds.

18

(a)(1), (3) & (c).)  Financial elder abuse occurs whether the elder holds the property directly or a "representative" of the elder, such as a trustee, holds the property.  (*Id.*, subds. (c), (d)(1).)  An elder is anyone 65 years of age or older.  (Welf. & Inst. Code, § 15610.27.)

Lee was over 71 years old at the time of trial in June 2012.  Thus, in December 2006, when Kim took the interest in SNI, Lee would have been at least 65 years old and an elder under the statute.  As discussed in the foregoing part, Lee established Kim took the interest in SNI through undue influence.  It might also be said Kim took it for a wrongful use, in that Lee intended the property to provide for her retirement, and Kim took it for her own benefit, even though Lee made clear she intended her children to have the property only upon her death.  Lee therefore proved financial elder abuse.

### 5. *Kim's Cross-complaint*

We turn lastly to Kim's cross-complaint.  She contends if we reverse the judgment for Lee on the complaint, her cross-complaint automatically "regain[s] vitality," and we must remand for retrial on her cross-complaint.  This is her sole contention as to her cross-complaint.  She does not argue she proved her causes of action and we should reverse on that ground.  Because we are not reversing the judgment for Lee on the complaint, Kim's argument necessarily fails.

**DISPOSITION**

The judgment is affirmed.  Lee shall have costs on appeal.


FLIER, J.

WE CONCUR:



BIGELOW, P. J.                          RUBIN, J.


19