Filed 10/22/15  D'Arcy v. Galperin CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BRIAN D'ARCY, as Trustee, etc.,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>RON GALPERIN, as Controller, etc., et al.,<br><br>Defendants and Respondents. | B256016<br>(Los Angeles County<br>Super. Ct. No. BS146924) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

Law Offices of Robert S. Gerstein and Robert S. Gerstein; Schwartz, Steinsapir, Dohrmann & Summers, D. William Heine and Daniel E. Curry, for Plaintiff and Appellant.

Michael N. Feuer, City Attorney, James P. Clark, Chief Deputy City Attorney, Thomas H. Peters, Chief Assistant City Attorney, Valerie L. Flores and Gregory P. Orland, Deputy City Attorneys, for Defendants and Respondents.

In the underlying action, appellant Brian D'Arcy, in his capacity as union trustee of two institutes established by the Los Angeles Department of Water and Power (DWP) and International Brotherhood of Electrical Workers, Local 18, AFL-CIO (Local 18), filed a petition for writ of prohibition or mandamus against respondent Ron Galperin, in his capacity as Controller of the City of Los Angeles (Controller).  Appellant sought to quash subpoenas issued by the Controller in order to conduct an audit of the two institutes.  The trial court declined to quash the subpoenas and denied the petition.  We conclude that the instruments establishing the institutes as trusts authorized respondent's audit, and thus affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *Background*

Respondent City of Los Angeles (City) is a charter city.[1]  Under the City's charter, the Controller is the "'auditor and general accountant of the City.'"  (L.A. Charter, § 260.)  The Controller exercises general supervision of all City departments charged with the receipt, collection, or disbursement of City money, including the DWP.  (L.A. Charter, § 260.)  Section 20.55 of the Los Angeles Administrative Code further authorizes the Controller to "inspect and audit the books, accounts, funds and securities of every person charged in any way with the safe-keeping or disbursement of public money or securities," and section 20.60 of that code empowers the Fraud, Waste and Abuse Unit in the Controller's office "to identify and prevent losses of City funds and resources . . . ."

---

[1]    A charter city "is constitutionally entitled to exercise exclusive authority over all matters deemed to be 'municipal affairs.'  (Cal. Const., art. XI, § 5.)" (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 783.)  Generally, a charter city's electorate may determine the charter's provisions, subject to certain constitutional and statutory limitations. (*Howard Jarvis Taxpayers Assn. v. City of San Diego* (2004) 120 Cal.App.4th 374, 385.)

2

B.  *The Institutes*

The DWP and Local 18 initiated the creation of the institutes through collective bargaining to improve the safety and training of DWP employees.  Each institute was intended to be an independent irrevocable trust, governed by a board of trustees made up of equal numbers of trustees appointed by the DWP and Local 18.

1.  *Joint Safety Institute*

The Joint Safety Institute (JSI) was established in 2000.  In July 2000, the DWP/Local 18 Joint Labor/Management Resolution Board executed a letter of agreement amending the existing memorandum of understanding, stating:  "'[T]he JSI shall be an established trust -- an institutionalized and contract-based independent body advocating promotion of worker safety through more focused information sharing, training, and mentoring and a strategic partnership which furthers the overall safety effort of the [DWP].'"[2]  The letter of agreement obliged the DWP to provide a minimum of  $1.2 million per fiscal year to fund the JSI.  On October 3, 2000, the Board of Water and Power Commissioners -- the DWP's governing body -- approved the proposed "Agreement and Declaration of Trust of JSI" (JSI trust agreement), and authorized DWP's manager to execute it.

On October 10, 2000, the Los Angeles City Council adopted Ordinance 173560, which declared:  "'The [JSI trust agreement] . . . establishing a non-profit, independent entity . . . as an irrevocable trust jointly managed and operated by the parties through a duly-constituted [b]oard of [t]rustees acting for the benefit and in the fiduciary interest of those DWP employees represented by Local 18 is hereby

---

[2]     At appellant's request, we hereby take judicial notice of the parties' memorandum of understanding.  (*Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629, 647, fn. 13; Evid. Code, §§ 452, 459.)

3

approved and ratified by the City in all particulars not contrary to law.'" On October 17, 2000, Mayor Richard Riordan approved the ordinance.

### 2. *Joint Training Institute*

The creation of the Joint Training Institute (JTI) in 2002 followed a similar pattern. In April 2002, the DWP/Local 18 Joint Labor/Management Resolution Board executed a letter of agreement amending the existing memorandum of understanding, stating that Local 18 and the DWP intended to create the JTI "'as an independent and advisory body that will review and recommend the feasibility of and requirements for institutionalized preparatory and competency-based training and learning opportunities that create a flexible and skilled workforce that is committed to excellence in public service.'" In May 2002, the Board of Water and Power Commissioners authorized the execution of the proposed agreement and declaration of trust regarding the JTI (JTI trust agreement).

On August 7, 2002, the Los Angeles City Council adopted Ordinance 174771, which declared: "'The [JTI trust agreement] . . . establishing a non-profit, independent entity . . . as an irrevocable trust jointly managed and operated by the parties through a duly-constituted [b]oard of [t]rustees acting for the benefit and in the fiduciary interest of those DWP employees represented by Local 18 is hereby approved and ratified by the City in all particulars not contrary to law.'" The ordinance noted the DWP's obligation to provide $6 million to fund the JTI during the first three years of its operation. On August 14, 2002, Mayor James Hahn approved the ordinance.

### C. *Events Preceding Underlying Action*

Prior to September 2013, the Controller's office never sought to audit the institutes. Beginning on September 19, 2013, the Los Angeles Times published a

series of articles regarding the institutes, alleging that they lacked transparency and were apparently inefficacious, and that the DWP had little information regarding how the funds it had contributed to them had been spent. On September 20, 2013, the Controller announced that he was initiating an audit of the institutes. On the same date, the Controller informed the DWP of his intent to carry out an audit, asserting that Section 12 of an article entitled "Miscellaneous" (section 12) found in each trust agreement authorized such an audit. That provision states in pertinent part: "Either the DWP or [Local 18], or both, may at any time, but not more often than once every calendar year, require that the [t]rust be audited either by an independent certified public accounting firm or by the Controller . . . ."

On October 15, 2013, Local 18 provided notice to the DWP and the trustees of the institutes that it was exercising its prerogative under section 12 to require that the institutes be audited in 2013 by Miller Kaplan Arase LLP, a certified public accounting firm (Miller firm). Later, after the Board of Water and Power Commissioners approved a resolution requesting the Controller to audit the institutes, the Controller informed the institutes' trustees of his intent to conduct an audit, and asked them to pick an "'audit liaison'" to assist his office. The Controller asserted that his audit was authorized by his power "'to inspect and audit the books . . . of every person charged in any way with the safe-keeping or disbursement of public money'" (L.A. Admin. Code, § 20.55), and by the request for an audit by the DWP's governing body.

On December 13, 2013, the trustees deadlocked over whether to designate the audit liaison. The union trustees maintained that the Controller lacked the authority to audit the trusts except as provided in the trust agreements, and the DWP trustees asserted that the Controller had the authority to conduct an audit. Notwithstanding the deadlock, the Controller informed the trustees that he intended

5

to audit the institutes, and scheduled an "audit entrance conference" for January 8, 2014.

On the first day of 2014, Local 18 provided notice by e-mail to the DWP and the trustees of the institutes that it was exercising its prerogative under section 12 to require that the institutes be audited in 2014 by the Miller firm. The following day, at the opening of business, written notices of that decision were hand delivered to the DWP and the trustees.

On January 8, 2014, the union trustees informed the Controller that they would not participate in the audit entrance conference scheduled for that day. They asserted that section 12 of the trust instruments permitted no more than one audit per calendar year, and that the New Year's Day request by Local 18 thus precluded any audit at the request of the DWP for the calendar year 2014. They further maintained that section 20.55 of the Los Angeles Administrative Code did not authorize the audit because the institutes were not charged with the safekeeping or disbursement of public funds.

On January 8, 2014, after receiving the union letter, the Controller requested that the City Clerk issue subpoenas to appellant as union trustee for the institutes and the institutes' custodians of records. On January 16, 2014, at the Controller's request, the City Clerk withdrew those subpoenas, and issued new subpoenas directed to appellant as union trustee for the institutes and the institutes' custodians of records. On January 17, 2014, counsel for appellant and the City Attorney, on behalf of the Controller, reached an agreement providing for acceptance of service and a stay of the subpoenas pending a resolution of the dispute in superior court.

6

D. *Underlying Action*

On January 23, 2014, appellant filed a petition for a writ of prohibition or mandate, seeking to quash the subpoenas. Shortly thereafter, appellant filed a motion to quash the subpoenas. On March 25, 2014, following a hearing, the trial court declined to do so. The court concluded that section 12 of the trust instruments did not authorize the Controller's audit for the calendar years 2013 and 2014 because Local 18 had elected to have the Miller firm perform that task, but that section 20.55 of the Los Angeles Administrative Code empowered the Controller to audit the institutes. A judgment denying appellant's petition and motion to quash the subpoenas was entered on April 22, 2014. This appeal followed.[3]

## DISCUSSION

Appellant asserts that the trial court erred in declining to quash the subpoenas, contending primarily that section 20.55 of the Los Angeles Administrative Code does not authorize the Controller's audit of the institutes. As explained below, it is unnecessary for us to examine that contention because we conclude that section 12 of the trust instruments empowered the Controller to conduct the audit at the DWP's request, notwithstanding Local 18's election to have the Miller firm conduct audits of the institutes for the calendar years 2013 and 2014. For that reason, appellant has established no basis for relief by writ of mandate.

---

[3] In May 2014, while the appeal was pending, appellant filed a petition for writ of supersedeas to stay enforcement of the judgment. On June 18, 2014, after issuing a temporary stay, we granted the petition, ordered that the appeal proceed as an expedited matter, and dissolved the temporary stay.

7

A. *Standard of Review*[4]

Traditional mandamus (Code Civ. Proc., § 1085) lies to correct an abuse of discretion. (*Rando v. Harris* (2014) 228 Cal.App.4th 868, 876 (*Rando*); *Khan v. Los Angeles City Employees' Retirement* (2010) 187 Cal.App.4th 98, 108 (*Khan*).) Under the City's charter, the Controller may direct the issuance of subpoenas in the course of an investigation. (L. A. Charter, § 217(b).) The question thus presented to the trial court was whether the issuance of the subpoenas constituted an abuse of discretion, that is, whether the decision to issue them "was arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair." (*Khan*, *supra*, 187 Cal.App.4th at p. 106.) To resolve that question, the trial court examined whether section 12 of the trust instruments or the City's Charter and Administrative Code authorized the Controller's proposed audit.

Because the trial court and appellate court perform the same function in mandamus actions, we do not review the trial court's findings or conclusions, but independently examine whether the issuance of the subpoenas was an abuse of discretion. (*Rando*, *supra*, 228 Cal.App.4th at p. 876; *Khan*, *supra*, 187 Cal.App.4th at pp. 105-106; *Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1393.) As discussed further below (see pt. B., *post*), to the extent the Controller's decision to issue the subpoenas relied on section 12 of the trust instruments, the decision presents a question of law

---

[4]    Although appellant sought a writ of prohibition as an alternative to traditional mandamus, the trial court determined that a writ of prohibition was not an appropriate remedy regarding the issuance of the subpoenas. Because appellant does not challenge that aspect of the trial court's ruling on appeal, he has forfeited any contention of error concerning it.

8

regarding the interpretation of section 12 that we review de novo. (*Rando*, *supra*, 228 Cal.App.4th at p. 876.)[5]

---

[5] During oral argument, appellant's counsel contended our focus must be solely on legal issues likely to recur between the parties -- in particular, the Controller's claimed authority to conduct audits of the institutes independent of the trust instruments -- because a settlement agreement between the parties had rendered moot the denial of appellant's motion to quash the subpoenas. Generally, "[a]n appeal should be dismissed as moot when the occurrence of events renders it impossible for the appellate court to grant appellant any effective relief." (*Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479.) Nonetheless, "there are three discretionary exceptions to the rules regarding mootness: (1) when the case presents an issue of broad public interest that is likely to recur [citation]; (2) when there may be a recurrence of the controversy between the parties [citation]; and (3) when a material question remains for the court's determination [citation]." (*Id.* at pp. 479-480.)

Although the settlement agreement predated the filing of appellant's opening brief, appellant's briefs do not suggest the settlement agreement required an exercise of our discretion to address an otherwise moot appeal. Generally, "we need not consider any issue which, although raised at oral argument, was not adequately raised in the briefs." (*Sunset Drive Corp. v. City of Redlands* (1999) 73 Cal.App.4th 215, 226.) Here, appellant's opening brief stated only that the settlement agreement "partly resolv[ed] the issues in this action." Respondent's brief maintained in response that the settlement agreement concerned "matters not at issue in this appeal."

Independent of appellant's failure to raise the issue of mootness adequately in the briefs, we conclude the settlement agreement does not render moot the denial of appellant's motion to quash the subpoenas. The subpoenas in question sought "information, data, records and reports" related to the institutes covering the period from July1, 2008 through December 31, 2013. In contrast, the settlement agreement states that it resolves disputes regarding the City's auditing of the institutes for a distinct -- albeit, overlapping -- period, namely, "the fiscal years 2009-2010, 2010-2011, 2011-2012, 2012-2103, and 2013-2104." Furthermore, the agreement expressly states that it "shall not . . . affect the positions or arguments of any party pertaining *to any other fiscal year*[]" in the underlying action." (Italics added.) The settlement agreement therefore does not render moot the validity of the subpoenas at issue, as they sought information regarding a period of time outside the scope of the settlement agreement.

1. *Interpretation of Trust Instruments*

Generally, "'"[i]n construing trust instruments, as in the construction and interpretation of all documents, the duty of the court is to first ascertain and then, if possible, give effect to the intent of the maker." [Citations.]' [Citation.] '[Probate Code s]ection 21102 provides, "[T]he intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument."' [Citations.]" (*In re Estate of Cairns* (2010) 188 Cal.App.4th 937, 944 (*Cairns*).) In interpreting a trust instrument, we seek a construction that respects the language used (*Huscher v. Wells Fargo Bank* (2004) 121 Cal.App.4th 956, 972), and avoids rendering key phrases as surplusage (*Comstock v. Corwin* (1952) 111 Cal.App.2d 770, 772-773).[6]

"The interpretation of . . . a . . . trust instrument presents a question of law unless interpretation turns on the credibility of extrinsic evidence or a conflict therein." (*Burch, supra*, 7 Cal.4th at p. 254.) Here, the material facts surrounding the execution of the trust instruments are not in dispute, and as the trial court noted, no extrinsic evidence was submitted bearing on section 12 of the instruments. We therefore look to the trust agreements themselves to interpret section 12. (*Cairns, supra*, 188 Cal.App.4th at p. 944.)

B. *JSI and JTI Trust Agreements*

The main provisions of the trust agreements are similar in form and content. The recitals of the agreement set forth the purposes of each institute. Included among the recitals is a section entitled "Mission Statement." Within that section, the JSI trust agreement states that the JSI is intended to foster workplace health and

---

[6] For interpretative purposes, there is no distinction between inter vivos and testamentary trusts. (*Burch v. George* (1994) 7 Cal.4th 246, 254, fn. 5 (*Burch*); *Wells Fargo Bank v. Huse* (1976) 57 Cal.App.3d 927, 932.)

safety, and "'promote open communication and mutual trust and respect between labor and management on issues of health and safety.'" Within the analogous section, the JTI trust agreement states that the JTI is intended to advise the DWP regarding safety, conduct studies regarding desirable training, identify retraining opportunities, and develop outreach programs.

Also included within the recitals in each agreement is a section entitled "Philosophy." Within that section, the JSI trust agreement affirms the parties' commitment to the value of safety, and states that "[l]abor and management must continuously work toward mutual trust and respect." Similarly, within the analogous section, the JTI trust agreement affirms the parties' commitment to the value of training, and again states that "[l]abor and management must continuously work toward mutual trust and respect."

In each agreement, the key provisions regarding the structure and funding of the trusts are set forth in Articles II through X. Articles VI, IX and X set forth the trustees' principal duties and powers regarding the funds provided by the DWP, which are specified in Article VIII. Under Article X, title to the funds is "vested in" the trustees. Article IX directs the trustees to administer the funds "in a manner consistent with [the a]greement and applicable law." Article VI states that the trustees "are fiduciaries," and provides: "The [t]rustees shall maintain books, records, and accounts of all of their transactions as [t]rustees. Such books, records and accounts of the [t]rustees shall be audited annually, or more often, as the [t]rustees shall determine, by a certified public accountant."

Also pertinent here are the provisions regarding governance of the trusts, which are found in Articles IV and V. Section 1 of Article IV obliges the DWP and Local 18 to select an equal number of trustees, designated the "[e]mployer" and "[u]nion" trustees. Section 2 of Article V provides that for purposes of governing the trust, each group of trustees is allocated a single vote on any given

11

matter. Section 3 of Article V further provides that unless the votes "concur," the matter is deadlocked, and is subject to a specified dispute procedure. Section 6 of Article V states: "In the event of a deadlock . . . , the matter may . . . be referred . . . for final decision to a neutral person to decide such dispute, and if the [t]rustees cannot agree upon a neutral person . . . , the [s]uperior [c]ourt . . . may be petitioned to appoint such neutral person, and the decision of such neutral person shall be final and binding upon the parties with respect to the matter referred to such neutral person for decision."

Section 12, the key provision at issue here, is located in an article entitled "Miscellaneous."[7] As elaborated below (see pt. D., *post*), section 12 empowers the DWP and Local 18 to require audits. Aside from setting forth section 12, section 1 of the article entitled "Miscellaneous" states: "This [t]rust is created and accepted in California, and all questions pertaining to the validity or construction of the trust estate and the operation and conduct thereof shall be determined in accordance with the laws of the State of California . . . ." Section 4 of the article further states that the institute "is an independent body, and not the agency, subsidiary, or affiliate of either the DWP or [Local 18]."

C. *Analysis*

In view of the express terms of the trust agreements, we apply California law regarding trusts in construing section 12. California applies the common law of trusts, "[e]xcept to the extent that the common law rules governing trusts [have been] modified by statute . . . ." (Prob. Code, § 15002.) Thus, when necessary, we look to the Restatement Third of Trusts for guidance. (*Lonely Maiden*

---

[7]     That article is Article XII in the JSI agreement and Article XI in the JTI agreement.

*Productions, LLC. v. GoldenTree Asset Management, LP* (2011) 201 Cal.App.4th 368, 379.)

Our inquiry is governed by the established principle that "'"[i]n construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it." [Citations.]' [Citation.]" (*Cairns*, *supra*, 188 Cal.App.4th at p. 944.) Under that principle, "in ascertaining the intention of the trustor[,] the court is not limited to determining what is meant by any particular phrase[,] but may also consider the necessary implication arising from the language of the instrument as a whole." (*Brock v. Hall* (1949) 33 Cal.2d 885, 890 (*Brock*).) Thus, an interpretation to which a provision may be susceptible when viewed in isolation must be rejected when it is inconsistent with the apparent purposes of the trust instrument, viewed as a whole, and would defeat those purposes. (*Lawrence v. Wilson* (1919) 44 Cal.App. 690, 693; see *Brock*, *supra*, 33 Cal.2d at p. 891 [despite absence of specific provision establishing distribution of trust assets upon dissolution of trust, such distribution was implied by reference to trustor's intent, as shown by "four corners" of trust instrument].) We therefore examine the trust agreements as a whole in construing section 12.[8]

Viewed as a totality, the agreements reveal the DWP's and Local 18's intent to establish the institutes as irrevocable trusts. Because the DWP and Local 18 agreed to create the trusts through collective bargaining, each is properly regarded as a trustor or settlor (1 Rest.3d Trusts, § 3, com. a, p. 36 ["'trustor'" and "'settlor'" designate creators of trust]), even though only the DWP funds the trusts.

---

[8]    Generally, "in the field of interpreting trusts and wills, each case depends upon its own peculiar facts, and '"precedents have comparatively small value . . . ."'" (*Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 453, quoting *Estate of Lawrence* (1941) 17 Cal.2d 1, 6.)

13

(1 Rest.3d Trusts, § 10, com. g, p. 152 ["If a promise to create a trust is made for a consideration and the promised trust is thereby or thereafter created, the person who supplies the consideration is the 'settlor' . . . ."]; (Bogert et al., The Law of Trusts and Trustees (3d ed. 2007) § 41, p. 440, ["One who furnishes the consideration necessary to induce another to create a trust is the settlor of the trust when it is created."].)[9] Ordinarily, the trustor, as such, retains no control over an irrevocable trust. (3 Rest.3d Trusts, § 94, com. d(2), p. 7.) Nonetheless, the terms of the trust instrument may reserve to the trustor the power to direct or control the trustees regarding specific matters. (3 Rest.3d Trusts, § 75, p. 51.) When the power is for the benefit of the trust's beneficiaries, the power is held by the trustor in a fiduciary capacity, regardless of whether the trustor is also a beneficiary. (3 Rest.3d Trusts, § 75, com. c(2), p. 55; see *Crocker-Citizens National Bank v. Younger* (1971) 4 Cal.3d. 202, 210-211 [power delegated by trustor to committee intended to advise trustees was fiduciary in character].)

Here, section 12, by its plain language, reserves to the DWP and Local 18 the power to require an audit: "Either the DWP or [Local 18], or both, may at any time, but not more often than once every calendar year, require that the [t]rust be audited either by an independent certified public accounting firm or by the Controller . . . ." As appellant acknowledges, section 12 constitutes an "oversight provision." Because section 12 itself confers no pecuniary interest in the trust funds or control over them on the DWP and Local 18, the power it establishes is

---

[9]     As noted in *In re Estate of Giraldin* (2012) 55 Cal.4th 1058, 1073, we may consider the treatise cited above in interpreting California trust law.

for the benefit of the beneficiaries. (3 Rest.3d Trusts, § 75, com. c(2), pp. 54-55.) That power is thus held by the DWP and Local 18 in a fiduciary capacity.[10] (*Ibid.*)

We turn to the central question before us, namely, the precise power granted to the DWP and Local 18 under section 12. Before the trial court and on appeal, appellant has argued that the meaning of section 12 is "clear," namely, only one audit may be required in a calendar year. On appellant's proposed interpretation, therefore, the limiting phrase in section 12 -- namely, "but not more often than once every calendar year" -- operates to restrict the total number of audits that may occur in a calendar year.

In contrast, before the trial court and on appeal, respondents have maintained that the limiting phrase merely restricts the number of audits *each* trustor may require in a calendar year. They contend that appellant's proposed interpretation nullifies the phrase "or both" in section 12, which they argue manifests an intent to permit both trustors to require an audit in a calendar year. In addition, they argue that appellant's proposed interpretation is unreasonable because "it would allow one party to block perpetually the ability of the other party to conduct an audit by asking for the audit first each year."

We agree with respondents that section 12 permits each trustor to require one audit per year by an independent certified public accounting firm or the Controller. As discussed above, section 12 must be interpreted in light of the trustors' "primary purpose," as disclosed by the trust agreements as a whole. (*Brock*, *supra*, 33 Cal.2d at p. 891.) For that reason, the correct interpretation of section 12 cannot be determined merely by examining the phrase "Either the DWP or [Local 18], or both, . . ." in isolation. Indeed, it is well established that the word

---

[10]    Because these determinations regarding the power follow solely from the DWP's and Local 18's status as trustors, it is unnecessary to resolve a dispute between the parties whether the DWP and Local 18 are also beneficiaries of the trusts.

15

"or" in a written instrument must be construed in a manner that effectuates the parties' overall intent. (*Universal Sales Corp. v. Cal. Etc. Mfg. Co.* (1942) 20 Cal.2d 751, 775-776; *Estate of Christen* (1965) 238 Cal.App.2d 521, 526, fn. 2; *McNeil v. Graner* (1949) 91 Cal.App.2d 858, 864.)

Only respondents' interpretation of section 12 respects the language and purposes of the trust instruments. That interpretation comports with the terms of section 12 itself, as the phrase "either . . . or . . . or both" is commonly used to state that two alternatives are not exclusive, and that each may occur, notwithstanding the occurrence of the other. (Merriam-Webster's Collegiate Dict. (1995) p. 134 ["both" is "used as a function word to indicate and stress the inclusion of each of two or more things specified by coordinated words"].) Thus, section 12 is reasonably understood as providing that *each* trustor "may at any time, but not more often than once every calendar year, require that the [t]rust be audited . . . ."

Respondents' interpretation also promotes the purposes of the trust agreements. The agreements expressly assert the DWP's and Local 18's commitment to "work[ing] together toward mutual trust and respect" through the institutes. In furtherance of that commitment, the governance of the trusts reflects a finely balanced structure designed to prevent domination by either side: the employer trustees and the union trustees are allocated a single vote regarding any given matter, and in the event of deadlock, the matter is to be resolved by a neutral third party.

Respondent's interpretation facilitates the parties' commitment to cooperation and the avoidance of domination by permitting each trustor to require an audit, regardless of the other trustor's conduct. As explained above, because section 12 grants each trustor a power of oversight designed to benefit the beneficiaries, the trustors are "subject to fiduciary duties in the exercise of the power . . . ." (3 Rest.3d Trusts, § 75, com. e, p. 56.) Respondents' interpretation

16

thus secures each trustor's ability to discharge those duties, when necessary, for the benefit of the beneficiaries.

In contrast, appellant's proposed interpretation is inconsistent with the primary purposes of the trust agreements, and operates to defeat them. Under that interpretation, only the first trustor to request an audit in a calendar year will be able to exercise its fiduciary oversight power. Such an interpretation compels a race to request an audit between the trustors that is of no discernible benefit to the trusts. Indeed, under appellant's interpretation, the DWP's only prospect of securing an audit in 2014 would have been to request one in the first moments of the new year, prior to Local 18's e-mail requesting an audit. Nothing in the trust agreements, viewed as a whole, suggests that the trustors' intent was to circumscribe their oversight power in a manner that frustrates cooperation, facilitates arbitrary domination, and impairs their ability to resolve concerns regarding the trusts' operation.

Appellant maintains that we must accept his interpretation of section 12 for the reasons stated by the trial court. In ruling on appellant's petition and motion to quash, the court agreed with appellant's interpretation, concluding the phrase "or both" merely authorized the parties' joint direction for a single audit, not two separate audits. The court reasoned that because Article VI requires the trustees to conduct at least one annual audit, respondents' interpretation of section 12 "would permit three audits per year, not two, without any good cause requirement for doing so." Pointing to the court's rationale, appellant contends his interpretation provides a "commonsense understanding" of section 12, arguing that the limitation on audits the interpretation proposes "is tempered by the independent provision of a regular annual audit . . . . It is reasonable . . . to read the [a]greements to . . . permit two audits a year . . . but not three or more audits in the same year." We disagree.

17

As explained above, section 12 must be regarded as granting each trustor the right to request an audit, beyond the annual audit performed by the trustees. Appellant's suggestion that the existence of the annual audit provided for in Article VI satisfies the need for oversight ignores the fact that the trust expressly permits a trustor to initiate another audit in addition to the Article VI audit. Moreover, the absence of an express "good cause requirement" for an audit does not necessitate interpreting section 12 to permit only one audit in order to limit the number of potentially unjustified trustor-initiated audits. Because the trustors' oversight powers are fiduciary in character, they are subject to fiduciary duties in exercising that power "comparable to those of a trustee . . . ." (3 Rest.3d Trusts, § 75, com. e, p. 56.) As trustees are generally required to act "solely in the interest of the beneficiaries" and with reasonable care (Prob. Code, §§ 16002, subd. (a), 16040, subd. (a)), the trustors may not require an audit without due attention to the beneficiaries' interests.[11]

---

[11] In a related contention, appellant contends we must accept the trial court's conclusion regarding the interpretation of section 12 because respondents failed to notice a cross-appeal regarding that conclusion. However, as noted above (see pt. A., *ante*), we independently review the Controller's decision to issue the subpoenas in assessing whether to affirm the judgment. Furthermore, respondents seek affirmance of the judgment on a theory not relied upon by the trial court, rather than reversal of a substantive portion of the judgment. To do so, respondents need not have noticed a cross-appeal. (*Central Manufacturing District, Inc. v. Board of Supervisors* (1960) 176 Cal.App.2d 850, 857.) Indeed, on appeal, "[w]e do not review the trial court's reasoning, but rather its ruling. A trial court's order is affirmed if correct on any theory . . . . [Citations]." (*J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 15-16.) Thus, we may affirm a ruling "on any basis presented by the record whether or not relied upon by the trial court." (*Day v. Alta Bates Medical Center* (2002) 98 Cal.App.4th 243, 252, fn. 1.) The decisions upon which appellant relies are distinguishable, as in each case the respondent effectively sought the *reversal* of a substantive aspect of the judgment without noticing a cross-appeal. (*Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439; *Kardly v. State Farm Mut. Auto. Ins. Co.* (1995) 31 Cal.App.4th 1746, 1748-1749, fn. 1; *California State Employeess' Assn. v. State Personnel Bd.* (1986) 178 Cal.App.3d 372, 382, fn. 7.)

In view of our conclusions, it is unnecessary to address appellants' remaining contentions regarding whether, independent of section 12 of the trust agreements, section 20.55 of the Los Angeles Administrative Code, taken together with the City Charter and the other provisions of the trust agreements, support the Controller's audit. As explained above, section 12 authorized the DWP's 2013 request for an audit of the institutes by the Controller, regardless of Local 18's requests for an audit in 2013 and 2014. The Controller thus did not abuse his discretion in directing the issuance of the pertinent subpoenas. In sum, the petition for writ of mandate and motion to quash were properly denied.

**DISPOSITION**

The judgment is affirmed.  Respondents are awarded their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


WILLHITE, Acting P. J.


COLLINS, J.